# APPENDIX.

## HERMAN *v.* THE STATE.

A law which absolutely forbids the people of the State to manufacture and sell whisky, ale, porter and beer, for use as a beverage, or at all, except for the government, to be sold by it as a medicine, and absolutely prohibits the use of these articles as a beverage, is unconstitutional.

It is an invasion by the government upon the faculties of industry possessed by individuals, when it attempts to appropriate to itself any particular branches of industry, or any business which is not of a public, general character.

There are certain absolute rights, and the right of property is among them, which, in all free governments, must of necessity be protected from legislative interference, irrespective of constitutional checks and . guards.

The power of the legislature to declare nuisances.

HABEAS CORPUS before a judge of the Supreme Court. *October 30, 1855.*

PERKINS, J.—*Herman* was arrested upon a charge of having violated the liquor act of 1855. He obtained a writ of *habeas corpus,* pursuant, to which he is now brought before us at chambers, with the cause of his detention in custody.

His counsel moves for his discharge on the ground that said liquor act is unconstitutional and void. The case is submitted to us upon the arguments heretofore filed in the Supreme Court in the case of *Bebee.*

We regret that this question has been thus presented to us. We had hoped that these applications would have been confined to the inferior courts till the Supreme

Court had decided upon the validity of the law in question.

But the legislature, acting, as we think, within the constitution, has conferred upon the citizen the right of suing out the writ of *habeas corpus* from the judges severally of the Supreme Court; the right has been exercised in this case, and it is not for us, upon slight pretexts, to shrink from the discharge of the duty thus, as we cannot, indeed, but believe, injudiciously imposed upon us.

Counsel on both sides concede in argument that the record presents the question of the validity of, at least, what is alleged to be the prohibitory portion of said liquor act, and that question will, therefore, without inquiry upon the point, be considered.

We approach it with all the caution and solicitude its nature is calculated to inspire, and that intention of careful investigation its importance demands, feeling that the consequences of the principles we are about to assert will not be confined in their operation to this case alone. Preliminary to the discussion of the main questions involved, however, the course of argument of counsel requires that we should say a word by way of fairly setting forth the duty this Court has to perform in the premises, viz., the simply declaring the constitutionality or unconstitutionality of the law, with an assignment of the reasons upon which the declaration is based.

It will not be for us to inquire whether it be a good or bad law, in the abstract, unless the fact, as it might turn out to be, should become of some consequence in determining a doubtful point on the main question. It not unfrequently becomes the duty of courts to enforce injudicious acts of the legislature because they are constitutional, and to strike down such as, at first view, appear to be judicious, because they are in conflict with the constitution.

With these remarks, we proceed to the examination of the feature of the liquor act of 1855, now more espe-

cially presented to the Court. We shall not spend time upon the inquiry whether, on the day it came into force, there were existing unsold manufactured products in the hands of the distillers and brewers upon which it operated, rendering them valueless, or whether such products had all been disposed of between the passage and taking effect of the law. We shall direct our investigation to the character of its operation upon the future manufacture, sale, and consumption of intoxicating liquors. And—

First. Is it prohibitory?

The first section enacts, "that no person shall manufacture, keep for sale, or sell" any ale, porter, malt beer, lager beer, cider, wine, &c. The second section permits the manufacture and sale of cider and wine, under certain restrictions, by any and all of the citizens of the State.

Other sections permit the manufacture of whisky, ale, &c., by persons licensed for the purpose, so far as may be necessary to supply whatever demands certain persons, called county agents, may make upon them. These agents are authorized to sell for medicinal, mechanical, chemical, and sacramental uses, and no other, and may procure their liquors of the licensed manufacturers, but are not required to do so, and, as matter of fact, do not, but obtain them, in most cases, from abroad. They constitute no part of the people engaged in business on their own account, but are appointed, under the law, by the county commissioners; supplied with funds from the county treasury; paid a compensation for their services by the county; sell at prices fixed for them, and make the profits and losses of the business for the public treasury, and not for themselves. We say they are furnished with public funds. They are so in all cases; for when they, in the first instance, invest their own, it is by way of loan to the county at a fixed rate of interest, and the amount is refunded by the county with interest. These selling agents, then, are, and for convenience, may be denominated government agents; for it is all one in prin-

ciple whether the government creates and furnishes them with funds through the medium of the counties, or appoints them directly by statute and supplies them with funds from the State treasury. To express, then, the substance of the main provisions of the law, they may be paraphrased thus:

Be it enacted, 1. That the trade and business of manufacturing whisky, ale, porter, and beer, now and heretofore carried on in this State, shall cease; except that any person specially licensed to manufacture for medicine, &c., for the government, may do so, and sell to that extent, if the government should conclude to buy of such person, but not otherwise.

2. That no person in this State shall sell any whisky, beer, ale, or porter, unless the sale be to an agent of the government, or by such agent, for medicine, &c.

3. That no person in this State shall drink any whisky, beer, ale, or porter, as a beverage, and in no instance, except as a medicine.

It thus appears that the law absolutely forbids the people of the State to manufacture and sell whisky, ale, porter and beer, for use as a beverage; or, at all, except for the government, to be sold by it for medicine, &c.; and it prohibits absolutely the use of those articles, by the people, as a beverage.

The exception as to the admission of foreign liquors under the constitution and laws of the *United States*, will not be noticed, for the reason that they are admitted simply because they cannot be prohibited, and not in accordance with the spirit and policy of the State statute; and such foreign liquors may or may not be obtained here according to the contingent action of other powers; and for the further reason, that their admission, if claimed to be a part of the object and policy of the State liquor law, in order to supply the people with liquor as a beverage, renders the law doubly objectionable, for while, according to such a view, the law designs to permit the use of liquors as a beverage, it prohibits the people from manufacturing for their own use.

It is as if the law were that the people might eat bread, but should not raise the grain and grind it into flour wherewith to make it. It would be an act to prohibit the people from themselves producing, and to compel them to purchase from abroad what they might need to eat and drink. It would involve the principle of an act to annihilate the State by starving the people constituting it, to death; and such legislation would hardly comport, we think, with a constitution established to promote the welfare and prosperity of the people.

We assume it as established, then, that the liquor act in question is absolutely prohibitory of the manufacture, sale, and use as a beverage, by the people of this State, of whisky, ale, porter, and beer. The opinion has been advanced that the manufacture for sale out of the State is not prohibited, but it has not the substance of a shadow; and the morality of that law which prohibits the distribution of pauperism and crime, disease and death, at home, but permits them to be scattered amongst our neighbors, is not to be envied. And we may as well remark here as anywhere, that if the manufacture and sale of these articles are proper to be carried on in the State for any purpose, it is not competent for the government to take the business from the people and monopolize it. The government cannot turn druggist and become the sole dealer in medicines in the State. And why? Because the business was, at and before the organization of the government, and is properly at all times, a private pursuit of the people, as much so as the manufacture and sale of brooms, tobacco, cloths, and the dealing in tea, coffee, and rice, and the raising of potatoes; and the government was organized to protect the people in such pursuits from the depredation of powerful and lawless individuals, the barons of the middle ages, whom they were too weak to resist single-handed by force; and for the government now to seize upon those pursuits, is subversive of the very object for which it was created. "A government is guilty of an invasion upon the faculties of industry possessed by individuals,

when it appropriates to itself a particular branch of industry, the business of exchange and brokerage for example; or when it sells the exclusive privilege of conducting it." Say's Political Economy, note to p. 134.

There are undertakings of a public character, such as the making of public highways, providing a uniform currency, &c., that a single individual has not power to accomplish, and which government must, therefore, prosecute; but they are not the ordinary pursuits of the private citizen.

These, certainly as the general rule, and we are not now prepared to name an exception, the government cannot engage in.

This is all we shall here say upon this point. Time and space forbid that we should elaborate all that arise in the case.

The question now presents itself—

Secondly. Could the legislature of this State enact the prohibitory liquor law under consideration?

Few, if any, judicial decisions will be found to aid us in investigating this question, as no such law, in a country possessed of a judiciary and a constitution limiting the legislative power, has, till of late, been enacted. Some twelve hundred years ago *Mahomet* made such a law a part of his religious creed in opposition to the *Jewish* and *Christian* systems which recommended the moderate, but forbade the excessive use of intoxicating liquors. This law of *Mahomet*, (Koran, pp. 25 and 93,) was perhaps the first prohibitory act, but it does not appear to have been adopted by civilized nations till its late revival, in some shape or other, in one or more of our sister states. Hence, it has not often, if at all, as to this point, passed under judicial consideration.

A number of European writers on natural, public, and civil law are cited by counsel on behalf of the State to show the extent of legislative power; but those writers, respectable, able, and instructive upon some subjects as they are admitted to be, are not authority here upon this point. They are dangerous—indeed, utterly blind

guides to follow in searching for the landmarks of legislative power in our free and limited government; for they had in view when writing, governments as existing when and where they wrote; under which they lived and had been educated, and which had no written constitutions limiting their powers—governments the theory of which was that they were paternal in character—that all power was in them by divine right, and they, hence, absolute; that the people of a country had no rights except what the government of that country graciously saw fit to confer upon them, and that it was its duty, like as a father towards his children, to command whatever it deemed expedient for the public good without first, in any manner, consulting that public, or recognizing in its members any individual rights.

Indeed, the discovery of the great doctrine of rights in the people as against the government, had not been made when the writers above referred to lived. Such governments as those described, could adopt the maxim quoted by counsel, that the safety of the people is the supreme law, and act upon it; and being severally the sole judges of what their safety, in the countries governed, respectively required, could prescribe what the people should eat and drink, what political, moral and religious creeds they should believe in, and punish heresy by burning at the stake, all for the public good. Even in *Great Britain*, esteemed to have the most liberal constitution on the Eastern continent, *Magna Charta* is not of sufficient potency to restrain the action of Parliament, as the judiciary do not, as a settled rule, bring laws to the test of its provisions. Laws are there overthrown only occasionally by judicial construction. But here, we have written constitutions which are the supreme law, which our legislators are sworn to support, within whose restrictions they must limit their action for the public welfare, and whose barriers they cannot overleap, under any pretext of supposed safety of the people; for along with our written constitutions, we have a judiciary whose duty it is, as the only means of

securing to the people safety from legislative aggression, to annul all legislative action without the pale of those instruments. This duty of the judicial department in this country, was demonstrated by Chief Justice MAR-SHALL in *Marbury* v. *Madison,* 1 Cranch 137, and has since been recognized as settled American law. The maxim above quoted, therefore, as applied to legislative power, is here without meaning.

Nor does it prove the power of the State legislature to enact the law in question, to show that the Supreme Court of the *United States* has decided that it cannot declare such a State law inoperative; for that Court can only declare void such State laws as conflict with the restrictions imposed upon State power by the constitution of the *United States;* and if, in that constitution, the states are not restrained from passing laws in violation of the natural rights of the citizen, the Supreme Court of the *United States* cannot act upon such laws when passed, because they do not fall within its jurisdiction. Hence, that Court has decided that a state may deprive its citizens of property without making compensation, and of the right of trial by jury (*Barron* v. *The Mayor, &c.,* 7 Pet. 243); may pass laws depriving them of vested rights in property, and of the benefit of judgments they may have obtained in courts, and the like (*Satterlee* v. *Mathewson,* 2 Pet. 380, and the license cases in 5 How. 504); and no redress be obtainable in the *United States* Courts because there are no provisions in the *United States* constitution prohibiting the passage of such state laws. But the Supreme Court of this State has decided that, under our State constitution, the legislature cannot enact a law for the taking of private property without making compensation; cannot deprive the citizen of the right of trial by jury; and cannot set aside the judgment of a court, &c. *Young* v. *The State Bank,* 4 Ind. R. 301.—*McCormick* v. *Lafayette,* 1 *id.* 48.—*The State* v. *Mead,* 4 Blackf. 309.

It does not, therefore, follow that because the constitution of the *United States* does not prohibit state legis-

lation infringing the natural rights of the citizen, such legislation is valid. The constitution of the *United States* may not, but that of the State may, inhibit it. And so, indeed, according to many eminent judges, may principles of natural justice, independently of all constitutional restraint. This doctrine has been asserted here. In *Andrews* v. *Russell*, 7 Blackf. 474, Judge DEWEY says: "We have said that the only provisions in the federal or State constitution restrictive of the power of the legislature, · · · · · are," &c. "There are certain absolute rights, and the right of property is among them, which in all free governments must of necessity be protected from legislative interference, irrespective of constitutional checks and guards."

Should we find, however, in the course of this investigation that the constitution of our free State does, in fact, sufficiently protect natural rights from legislative interference, as it surely does, or it is grievously defective, it will not become necessary for us to inquire whether, in any event, it might be proper to fall back upon the doctrine above so unhesitatingly asserted.

Does our constitution, then, prohibit the passage of such an act as that now being considered? A *dictum* is quoted by counsel from the opinion in *Bepley* v. *The State*, 4 Ind. R. 264, that "it is competent for the legislature to declare any practice deemed injurious to the public a nuisance, and to punish it accordingly;" and hence, it is reasoned, any property; but *dicta*, as counsel well know, are not necessarily law—are, in fact, generally unconsidered first impressions which, all legal experience proves, are thrown out by all judges in giving opinions, as habitually and thoughtlessly as violations of the constitution are perpetrated by the legislature in enacting laws, and infinitely more excusably. Scarcely an elaborate opinion is written not containing them. This the profession will understand, and hence, are not misled by them if erroneous.

And it must be manifest to every one, on a moment's consideration, that the doctrine just quoted cannot be

taken for law, and could not have been so intended, in an unlimited sense, by the learned judge who uttered it. The legislature cannot declare any practice it may deem injurious to the public a nuisance and punish it accordingly. It cannot so declare the practice of reading the Bible, though, perhaps the government of *Spain* once did. It cannot so declare the practice of worshipping God according to the dictates of one's own conscience, though perhaps *Massachusetts*, in the days of *Roger Williams*, did it. It cannot so declare the practice of teaching schools, though perhaps *Virginia* might have done so in 1674, when Governor *Berkly* wrote from that colony: "I thank God there are no free schools nor printing; and I hope we shall not have these hundred years; for learning has brought disobedience and heresy and sects into the world, and printing has divulged them, and libels against the best government. God keep us from both." It cannot so declare the holding of political meetings and making speeches, the bearing of arms, publishing of newspapers, &c., &c., however injurious to the public the legislature might deem such practices to be; and why? Because the constitution forbids such declaration and punishment, and permits the people to use these practices. So with property: the legislature cannot interfere with it further, at all events, than the constitution permits. In short, the legislature cannot forbid and punish the doing of that which the constitution permits; and cannot take from the citizen that which the constitution says he shall have and enjoy. If it can, then we think all will admit that the constitution itself is worthless, the liberties of the people a dream, and our government as despotic as any on earth.

And we may here remark that the legislature can add nothing to its power over things by declaring them nuisances. A public nuisance is that which is noxious—offensive to all the people who may come in contact with it—and the offensive quality is in the thing itself, or the particular manner of its use, and is neither in-

creased nor diminished by a legislative declaration. What the legislature has a right by the constitution to prohibit and punish, even to the forfeiture of property, it may thus deal with without first declaring the matter a nuisance; and whatever it has not a right by the constitution to prohibit and punish, it cannot thus deal with, even though it first fix upon it that odious name. To illustrate: The legislature has power, perhaps unlimited, over the public highways. It provides for opening, reparing, and vacating them. They are not the private property of the citizen. The legislature, therefore, may declare what obstructions shall be permitted, and what removed, whether they be in fact nuisances or not. So with Congress, in relation to the national highways for commerce. These are public for purposes of navigation, and are, perhaps, completely under the legislative power. So the legislature, when the practice was to license houses for the exclusive retail of spirituous liquors, that is, the sale of them in particular quantities at particular places, could impose conditions upon which the license should be granted, and could make the violation of the conditions cause of forfeiture, whether it was such as rendered the retailing house a nuisance or not, and whether it was so denominated or not.

But the legislature cannot declare the path from my house to my barn, nor any obstruction I may place in it, a nuisance, and order it discontinued; nor can it declare my store-room and stock of goods a nuisance, prohibit my selling them, and order them destroyed; because such acts would invade private property which the constitution protects. Still, the fact may be that the path and the store-room are nuisances which I have no right to maintain; for while I have the right to use my own property, still I must not so use it as to injure others. So all trades, practices, and property, may, by the manner, time, or place of use, become nuisances in fact, in quality; and subject, consequently, to forfeiture and abatement: for example, slaughter-houses in cities, or

some descriptions of retailing houses; and this the legislature may have inquired into, and, if the fact of nuisance be found, may have the forfeiture and abatement adjudged and executed. And it is the province of the judiciary to conduct the inquiry, and declare the fact, or deny it, as the truth may turn out to be. Many things, by such proceedings, have already become established nuisances at common law. By this mode, when a party loses his trade or property, he does so because of his own fault, and this according to the judgment of his peers, and the provision of the general law of the land, and not by the tyranny of the legislature whose enactment may not be the law of the land. See numerous cases collected on this point in the first chapter of Blackwell on Tax Titles.

In accordance with this doctrine, we find that the criminal code of this State has ever contained the general provision that any person who erected or maintained a nuisance should be fined, &c., and that the nuisance might be abated (2 R. S. pp. 428, 429, ss. 8 and 9) —a provision that submits it to the country, to-wit, a jury under the charge of the court, to decide the fact of nuisance. This provision the courts have been daily enforcing against various noxious subjects; and if breweries and casks of liquor are nuisances, why have they not been prosecuted and abated also? What was the need of this special law upon the subject? We have assumed thus far, upon this branch of the case, that the constitution protects private property and pursuits, and the use of private property by way of beverage as well as medicine. It may be necessary, at this day, to demonstrate the fact.

The first section of the first article declares, that all men are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness. Under our constitution, then, we all have some natural rights that have not been surrendered, and which government cannot deprive us of, unless we shall first forfeit them by our crimes; and to

secure to us the enjoyment of these rights, is the great end and aim of the constitution itself.

It thus appears conceded that rights existed anterior to the constitution—that we did not derive them from it, but established it to secure to us the enjoyment of them; and it here becomes important to ascertain with some degree of precision what these rights, natural rights, are.

Chancellor KENT, following BLACKSTONE, says: (vol. 2, p. 1.) "The absolute [or natural] rights of individuals may be resolved into the right of personal security, the right of personal liberty, and the right to acquire and enjoy property;" not some property, or one kind of property, but, at least, whatsoever the society organizing government, recognizes as property. How much does this right embrace, how far does it extend? It undoubtedly extends to the right of pursuing the trades of manufacturing, buying, and selling, and to the practice of using. These acts are but means of acquiring and enjoying, and are absolutely necessary and incidental to them. What, we may ask, is the right of property worth, stripped of the right of producing and using? "The right of property is equally invaded by obstructing the free employment of the means of production, as by violently depriving the proprietor of the product of his land." Say's Pol. Econ. 133.

In *Arrowsmith* v. *Burlingim*, 4 McLean, on p. 497, it is said: "A freeman may buy and sell at his pleasure. This right is not of society, but from nature. He never gave it up. It would be amusing to see a man hunting through our law books for authority to buy or sell or make a bargain." To the same effect Lord *Coke*, in 2 Inst. ch. 29, p. 47. Rutherforth's Inst. p. 20. This great natural right of using our liberty in pursuing trade and business for the acquisition of property, and of pursuing our happiness in using it, though not secure in *Europe* from the invasions of omnipotent parliaments, or executives, is secured to us by our constitutions. For in addition to the first section which we have quoted,

and aside from the fact that the very purpose of establishing the constitution was such security, by section 11, article 1, it is declared that we shall be secure in our "persons, houses, papers, and effects, against unreasonable search and seizure." By section 21, we have the right to devote our labor to our own advantage, and to keep our property or its value for our own use, as they cannot be taken from us without being paid for. And by section 12, it is declared that "every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law." These sections, fairly construed, will protect the citizen in the use of his industrial faculties, and in the enjoyment of his acquisitions. This doctrine is not new in this Court. In *Doe* v. *Douglass*, 8 Blackf. 10, in speaking of the limitations in our constitution upon the legislative power, it is said, "they restrain the legislature from passing a law impairing the obligation of a contract, from the performance of a judicial act, and from any flagrant violation of the right of private property. This last restriction we think clearly contained in the first and 24th sections of the first article of our constitution,"— that of 1816.

We lay down this proposition, then, as applicable to the present case; that the right of liberty and pursuing happiness secured by the constitution, embraces the right, in each *compos mentis* individual, of selecting what he will eat and drink, in short, his beverages, so far as he may be capable of producing them, or they may be within his reach, and that the legislature cannot take away that right by direct enactment. If the constitution does not secure this right to the people, it secures nothing of value. If the people are subject to be controlled by the legislature in the matter of their beverages, so they are as to their articles of dress, and in their hours of sleeping and waking. And if the people are incompetent to select their own beverages, they are also incompetent to determine anything in relation to their living, and should be placed

at once in a state of pupilage to a set of government
sumptuary officers; eulogies upon the dignity of human
nature should cease; and the doctrine of the competency
of the people for self-government be declared a delud-
ing rhetorical flourish. If the government can prohibit
any practice it pleases, it can prohibit the drinking of
cold water. Can it do that? If not, why not? If we
are right in this, that the constitution restrains the legis-
lature from passing a law regulating the diet of the
people, a sumptuary law, (for that under consideration is
such, no matter whether its object be morals or economy,
or both,) then the legislature cannot prohibit the manu-
facture and sale, for use as a beverage, of ale, porter,
beer, &c., and cannot declare those manufactured, kept
and sold for that purpose, a nuisance, if such is the use
to which those articles are put by the people. It all re-
solves itself into this, as in the case of printing, worship-
ping God, &c. If the constitution does not protect the
people in the right, the legislature may probably pro-
hibit; if it does, the legislature cannot. We think the
constitution furnishes the protection. If it does not in
this particular, it does, as we have said, as to nothing of
any importance, and tea, coffee, tobacco, corn-bread,
ham and eggs, may next be placed under the ban. The
very extent to which a concession of the power in this
case would carry its exercise, shows it cannot exist. We
are confirmed in this view when we consider that at the
adoption of our present constitution, there were in the
State fifty distilleries and breweries, in which a half a
million of dollars was invested, and five hundred men were
employed; which furnished a market annually for two
million bushels of grain, and turned out manufactured
products to the value of a million of dollars, which
were consumed by our people, to a great extent, as a
beverage. With these facts existing, the question of
incorporating into the constitution the prohibitory prin-
ciple was repeatedly brought before the constitutional
convention, and uniformly rejected. Debates in the
Conv. vol. 2 p. 1,434 and others. We are further

strengthened in this opinion when we notice, as we will as matter of general knowledge, the universality of the use of these articles as a beverage. It shows the judgment of mankind as to their value. "This use may be traced in several parts of the ancient world. *Pliny*, the naturalist, states that in his time it was in general use amongst all the several nations who inhabited the western part of *Europe*; and, according to him, it was not confined to those northern countries whose climate did not permit the successful cultivation of the grape. He mentions that the inhabitants of *Egypt* and *Spain* used a kind of ale; and says that, though it was differently named in different countries, it was universally the same liquor. See Plin. Nat. Hist. lib. 14, c. 22. *Herodotus*, who wrote five hundred years before *Pliny*, tells us that the *Egyptians* used a liquor made of barley. (2, 77.) *Dion Cassius* alludes to a similar beverage among the people inhabiting the shores of the *Adriatic*. Lib. 49, *De Pannoniis*. *Tacitus* states that the ancient *Germans*, for their drink, used a liquor from barley or other grain, and fermented it so as to make it resemble wine. *Tacitus De Mor. Germ. c.* 23. Ale was also the favorite liquor of the *Anglo-Saxons* and *Danes*. 'If the accounts given by *Isidorus* and *Orosius* of the method of making ale amongst the ancient *Britons* be correct, it is evident that it did not essentially differ from our modern brewing. They state 'that the grain is steeped in water and made to germinate; it is then dried and ground; after which it is infused in a certain quantity of water, which is afterwards fermented.' Henry's Hist. of Eng. vol. 2, p. 364. 'In early periods of the history of *England*, ale and bread appear to have been considered equally victuals or absolute necessaries of life.'"

In Biblical history we are told that the "vine, a plant which bears clusters of grapes, out of which wine is pressed," so abounded in *Palestine* that almost every family had a vineyard. *Solomon*, said to be the wisest man, had extensive vineyards which he leased to ten-

ants.  Song 8. verse 12; and *David*, in his 104th
psalm, in speaking of the greatness, power, and works
of God, says, verses 14 and 15, "He causeth grass to
to grow for the cattle, and herb for the service of man;
and wine that maketh glad the heart of man, and oil to
make his face shine, and bread which strengtheneth
man's heart."

It thus appears, if the inspired psalmist is entitled to
credit, that man was made to laugh as well as weep,
and that these stimulating beverages were created by
the Almighty expressly to promote his social hilarity
and enjoyment.  And for this purpose have the world
ever used them, they have ever given, in the language
of another passage of scripture, strong drink to him
that was weary and wine to those of heavy heart.  The
first miracle wrought by our Saviour, that at *Cana* of
*Galilee*, the place where he dwelt in his youth, and
where he met his followers after his resurrection, was
to supply this article to increase the festivities of a
joyous occasion; that he used it himself is evident
from the fact that he was called by his enemies a wine-
bibber; and he paid it the distinguished honor of being
the eternal memorial of his death and man's redemp-
tion.

From *De Bow's* compendium of the census of 1850,
p. 182, we learn that at that date there were in the
*United States* 1,217 distilleries and breweries, with a
capital of 8,507,574 dollars, consuming some 18,000,000
bushels of grain and apples, 1,294 tons of hops, and
61,675 hogsheads of molasses, and producing some
83,000,000 gallons of liquor.

From the Secretary of the Treasury's report of the
commerce and navigation of the *United States* for 1850,
we gather that there were imported into the *United
States*, in that year, about 15,000,000 gallons of various
kinds of liquors.

By the National Cyclopædia, vol. 12, p. 934, we are
informed that for the year ending *January* 5, 1850, there
were imported into *Great Britain* and *Ireland* 7,970,067

gallons of wine, 4,950,781 of brandy, and 5,123,148 of rum; and that there were manufactured in the same period, in that kingdom, in round numbers, 25,000,000 gallons.

In the 6th vol. of the same work, p. 328, it is said:

"The vine is one of the most important objects of cultivation in *France.* The amount of land occupied by this culture is about 5,000,000 *English* acres. The average yearly product is about 926,000,000 *English* gallons, of which about one-sixth is converted into brandy. The annual produce of the vineyards is estimated at about £28,500,000 sterling, [near 140,000,000 dollars,] of which ten-elevenths is consumed in *France."*. Wine is the common beverage of the people of *France,* and yet Professor *Silliman,* of *Yale* College, on the 17th of *April,* 1851, then at *Chalons,* writes:

"In traveling more than 400 miles through the rural districts of *France,* we have seen only a quiet, industrious population, peaceable in their habits, and, as far as we had intercourse with them, courteous and kind in their manners. We have seen no rudeness, no broil or tumult—have observed no one who was not decently clad, or who appeared to be ill fed. We are told, however, that the *French* peasantry live upon very small supplies of food, and in their houses are satisfied with very humble accommodations. Except in *Paris,* we have seen no instance of apparent suffering, and few even there; nor have we seen a single individual intoxicated or without shoes and stockings." Vol. 1, p. 185, of his Visit to Europe.

We have thus shown, from what we will take notice of historically, that the use of liquors, as a beverage, and article of trade and commerce, is so universal that they cannot be pronounced a nuisance. The world does not so regard them, and will not till the Bible is discarded, and an overwhelming change in public sentiment, if not in man's nature, wrought. And who, as we have asked before, is to force the people to discontinue the use of beverages?

Counsel say the maxim that you shall so use your own as not to injure another, justifies such a law by the legislature. But the maxim is misapplied; for it contemplates the free use, by the owner, of his property, but with such care as not to trespass upon his neighbor; while this prohibitory law forbids the owner to use his own in any manner, as a beverage. It is based on the principle that a man shall not use at all for enjoyment what his neighbor may abuse, a doctrine that would, if enforced by law in general practice, annihilate society, make eunuchs of all men, or drive them into the cells of the monks, and bring the human race to an end, or continue it under the direction of licensed county agents.

Such, however, is not the principle upon which the Almighty governs the world. He made man a free agent, and to give him opportunity to exercise his will, to be virtuous or vicious as he should choose, he placed evil as well as good before him, he put the apple into the garden of *Eden*, and left upon man the responsibility of his choice, made it a moral question, and left it so. He enacted as to that, a moral, not a physical prohibition. He could have easily enacted a physical prohibitory law by declaring the fatal apple a nuisance and removing it. He did not. His purpose was otherwise, and he has since declared that the tares and wheat shall grow together to the end of the world. Man cannot, by prohibitory law, be robbed of his free agency. See Milton's Areopagitica, or Speech for Liberty of Unlicensed Printing, Works vol. 1, p. 166.

But notwithstanding the legislature cannot prohibit, it can, by enactments within constitutional limits, so regulate the use of intoxicating beverages, as to prevent most of the abuses to which the use may be subject. We do not say that it can all; for under our system of government, founded in a confidence in man's capacity to direct his own conduct, designed to allow to each individual the largest liberty consistent with the

welfare of the whole, and to subject the private affairs of the citizen to the least possible governmental interference, some excesses will occur, and must be tolerated, subject only to such punishment as may be inflicted. This itself will be preventive in its influence. The happiness enjoyed in the exercise of general, reasonably regulated liberty by all, overbalances the evil of occasional individual excess. Order must not be made to reign here as once at *Warsaw*, by the annihilation of all freedom of action, crushing out, indeed, the spirit itself of liberty. With us, in the language of the then illustrious *Burke*, when defending the revolting *American* colonies, something must be pardoned to the spirit of liberty.

What regulations of the liquor business would be constitutional, it is not for us to indicate in advance; but those which the legislature may from time to time prescribe can be brought by the citizen to the constitutional test before the judiciary, and it will devolve upon that department to decide upon their consistency with the organic law; in fact, the question of power, of usurpation, between the people and the people's representatives; and in doing this, so far as it may devolve upon us, we shall cheerfully throw every doubt in favor of the latter, and of stringent regulations. Such is the constitution of our government. *Maize* v. *The State*, 4 Ind. R. 342.—*Thomas* v. *The Board of Commissioners of Clay county*, 5 *id.* 557.—*Greencastle Township* v. *Black*, 5 *id.* 557.—*Larmer* v. *The Trustees of Albion*, 5 Hill, 121. —*Dunham* v. *The Trustees of Rochester*, 5 Cow. 462.— *Cotter* v. *Doty*, 5 Ohio R. 395.

It is like the case of laws for the collection of debts. The constitution prohibits the passage of an act impairing the obligation of a contract; yet the legislature may regulate the remedy upon contracts, but must regulate within such limits as not substantially to impair the remedy, as that would indirectly impair the obligation of the contract itself. *Gantly's Lessee* v. *Ewing*, 3 How. U. S. 707.

Regulations within constitutional limits, we have no doubt, if efficiently enforced, will accomplish, as we have said, nearly all that can reasonably be desired.

The legislature, we will add, may undoubtedly require the forfeiture of such particular portions of liquor as shall be kept for use in violation of proper regulations, as in the case of gunpowder stored in a populous city, and this forfeiture will be adjudged by the judiciary (see *Cotter* v. *Doty, supra*); but neither all the gunpowder nor liquor in the State, accompanied by the prohibition of the further manufacture and use of the article, can be forfeited on account of the improper use of a given quantity, because the entirety of neither of the articles is a nuisance. It is not pretended to be so as to gunpowder, and we think we have shown it is not so as to liquor.

So, it is doubtless competent for the legislature to establish proper police regulations to prevent the introduction of foreign paupers, &c.; for there is a palpable difference between excluding a foreign, and expelling a citizen, pauper. The constitutional convention thought it might have power to prohibit the ingress of foreign, while it might not to compel the egress of resident, negroes.

So, by such regulations, may the introduction of nuisances be prevented; for there is a wide-difference between assuming to declare that a given thing is a nuisance, and the prohibiting of the introduction of what is conceded, or shall turn out to be, a nuisance.

And, in fact, the restrictions in the constitution upon the legislative power may operate for the benefit of those living under, and in some sense a party to, its provisions, and not for that of strangers. It will not be denied that but for the constitution and laws of the *United States* which impose the restriction, the State, as an independent sovereignty, might exclude from her borders all foreign liquors, whether nuisances, or not, unless, indeed, the doctrine upon which *Great Britain*

was defended in forcing trade with *China* at the cannon's mouth be correct—that in this day of Christian civilization, it is the duty of all nations to admit universal reciprocal trade and commerce—a doctrine not yet, we think, incorporated into the code of international law.

And it would not follow that, because the State might prohibit the introduction of foreign wheat, she could, therefore, prohibit the cultivation of it within the State by her own citizens. The right of the State to prevent the introduction of foreign objects does not depend upon the fact of their being nuisances, or offensive otherwise; but she does it, when not restrained by the constitution or laws of the *United States*, in the exercise of her sovereign will.

This, however, is a topic involving questions of power between the state and federal governments which we do not intend discussing in the present opinion. We limit ourselves here to the question of the power of the legislature over the property and pursuits of the citizen under the State constitution. The restrictions which we have examined upon the legislative power of the State were inserted in the constitution to protect the minority from the oppression of the majority, and all from the usurpation of the legislature, the members of which, under our plurality system of elections, may be returned by a minority of the people. They should, therefore, be faithfully maintained. They are the main safeguards to the persons and property of the State.

It is easy to see that when the people are smarting under losses from depreciated bank paper, a feeling might be aroused that would, under our plurality system, return a majority to the legislature, which would declare all banks a nuisance, confiscate their paper and the buildings from which it issues.

So with railroads, when repeated wholesale murders are perpetrated by some of them; and, in *Great Britain* and *France*, we have examples of the confisca-

tion of the property of the churches even; which, here, the same constitution that protects the dealer in beer, would render safe from invasion by the legislative power.

In our opinion for the reasons given above, the liquor act of 1855 is void. Let the prisoner be discharged.