1999-NMCA-122

989 P.2d 890

**PROTECTION AND ADVOCACY SYSTEM, INC., Plaintiff–Appellant,**

v.

**PRESBYTERIAN HEALTHCARE SER-VICES; Thomas R. Bryant; Jane Banes; Moses R. Kirby; and June Kirby, Defendants–Appellees**

**In the Matter of Henry Lynn Bryant**

**No. 20,385.**

Court of Appeals of New Mexico.

Aug. 3, 1999.

Certiorari Denied, No. 25,924, Sept. 13, 1999.

Michael Parks, Albuquerque, for Appellant.

Albert N. Thiel, Jr., Robinson, DiLando & Whitaker, P.C., Albuquerque, for Appellees Thomas R. Bryant, Jane Banes, Moses R. Kirby, and June Kirby.

Robert G. Cates, Cates & Hammel, P.C., Los Lunas, Guardian Ad Litem for Henry Lynn Bryant.

Janine R. Friede, Albuquerque, for Presbyterian Healthcare Services.

Robert Schwartz, Albuquerque, Amicus Curiae, at the request of the Court.

*OPINION* [1]

HARTZ, Judge.

{1} On April 8, 1999, Henry Lynn Bryant, a 51–year–old man with moderate mental retardation suffered a stroke. He was admitted to Presbyterian Hospital in Albuquerque, where he was treated for two weeks before being transferred to the nursing facility at Presbyterian Kaseman Hospital. To keep Mr. Bryant alive, the hospital supplied nutrition and hydration through a naso-gastric tube. Although the matter is not without dispute, Mr. Bryant appeared to be unconscious and unable to communicate.

---

1. On July 9, 1999, this Court filed its opinion in this case. On July 26, Protection and Advocacy System, Inc. filed a motion for rehearing and motion for limited reopening. We hereby deny Protection and Advocacy System, Inc.'s motion, but we withdraw our opinion of July 9, 1999, and substitute this opinion in its place.

On May 2, after consulting with members of her family, clergy, and medical personnel, Mr. Bryant's mother (Mrs. June Kirby) directed the Kaseman staff to terminate the nasogastric feeding. More than twenty years earlier Mrs. Kirby had received a court appointment as a limited guardian for her son, with the power "[t]o give or withhold consent for medical procedures for the diagnosis, prevention or cure of any disease."

{2} On May 4, 1999, Protection and Advocacy System, Inc. (P & A), went to court to try to maintain the naso-gastric feeding. P & A is a not-for-profit corporation authorized by federal law to pursue legal remedies on behalf of persons with developmental disabilities. Mr. Bryant had come to the attention of P & A because he had been a long-time resident of the Los Lunas Hospital and Training School, and had lived since the school's closing in a group home while receiving services from the Los Lunas Community Program. P & A filed pleadings in two different cases in Valencia County District Court. One pleading was filed in the proceedings that had been initiated in 1978 for the purpose of naming Mr. Bryant's parents as his limited guardians. That pleading sought an order rescinding Mrs. Kirby's decision to terminate nutrition and hydration care. The other pleading instituted a new action for injunctive relief, seeking an order barring the hospital and members of the Bryant family from terminating the nutrition and hydration care of Mr. Bryant.

{3} The Valencia County District Court responded expeditiously. It entered an order on May 5 that (1) required the hospital to "reinstate the provision of nutrition and hydration" for Mr. Bryant; (2) stated that Mrs. Kirby should serve as the surrogate for Mr. Bryant under the Uniform Health–Care Decisions Act, NMSA 1978, §§ 24–7A–1 to –18 (1995, as amended through 1997) (the UH–CDA); (3) appointed Robert G. Cates as guardian ad litem for Mr. Bryant; and (4) set a hearing for the following day. The court conducted a hearing on May 6 and a second hearing (by telephone) on Friday, May 7. After the May 7 hearing, the court ordered Mrs. Kirby to continue to act as Mr. Bryant's surrogate and dissolved its previous order requiring nutrition and hydration, effective at 5:00 p.m. on Friday, May 14. Because the May 7 hearing concluded after 5:00 p.m., the court was unable to file its order until Monday, May 10.

{4} On May 11, P & A filed with this Court an Emergency Application for Stay of Order Pending Appeal. We held oral argument on the motion on May 13. Counsel for P & A and for the Bryant family presented their arguments. We also heard from the guardian ad litem and from Professor Robert Schwartz, who appeared as amicus curiae at the request of the Court. Counsel for the hospital appeared but presented no argument.

{5} After hearing argument we denied the application for stay. Because counsel requested guidance for future cases, we now set forth our reasons for the denial. We review in some detail the statutory scheme and then explain why we hold that P & A lacked standing to bring this action.

*DISCUSSION*

**A. *The UH–CDA***

{6} This case, as it comes before us on appeal, is governed by the UH–CDA. Our statute closely follows the Uniform Health–Care Decisions Act (the Uniform Act) approved in 1993 by the National Conference of Commissioners on Uniform State Laws. *See* 9(I) U.L.A. 309 (Supp.1999). New Mexico was the first state to adopt the Uniform Act. *See id.* at 309. Delaware, Maine, and Mississippi apparently are the only other states to do so. *See* Del.Code Ann. tit. 16, §§ 2501–2518 (Supp.1998); Me.Rev.Stat. Ann. tit. 18–A, §§ 5–801 to –817 (West 1998); Miss. Code Ann. §§ 41–41–201 to –229 (West, WESTLAW through end of 1998 Reg. Sess.).

{7} As medical science has become ever more adept at prolonging life through artificial means, the courts have become increasingly involved in the profound question of when such means should be discontinued for particular patients. At first, the courts had to struggle to find answers without guidance from the legislature. *See, e.g., In re Quinlan,* 70 N.J. 10, 355 A.2d 647 (1976). But increasingly, state legislatures have provided statutory responses to the problem. New

Mexico's first statutory effort was the Right to Die Act, NMSA 1978, §§ 24–7–1 to –11 (1977, as amended through 1995) (repealed 1997). The concern of the statute was individuals who were suffering from a terminal illness or were in an irreversible coma. An adult of sound mind could execute a document, with all the formalities of a valid will, directing that maintenance medical treatment not be used to prolong life if a person was certified under the Act as suffering from a terminal illness or being in an irreversible coma. *See* § 24–7–3(A). Certification under the Act consisted of a written confirmation by two physicians, one of whom was the patient's treating physician, that the patient was terminally ill or in an irreversible coma. A spouse, parent, or guardian could in certain circumstances also execute such a document on behalf of a minor. *See* § 24–7–4. For an incompetent person who had not executed a document under the Act, maintenance medical treatment could be removed "when all family members who can be contacted through reasonable diligence agree in good faith that the patient, if competent, would choose to forego that treatment." § 24–7–8.1(A). There are no reported decisions under New Mexico's Right to Die Act.

{8} The UH–CDA provides broader coverage with less formality than did the Right to Die Act. Section 24–7A–1(G) of the UH–CDA defines "health-care decision" as

a decision made by an individual or the individual's agent, guardian or surrogate, regarding the individual's health care, including:

(1) selection and discharge of health-care providers and institutions;

(2) approval or disapproval of diagnostic tests, surgical procedures, programs of medication and orders not to resuscitate;

(3) directions relating to life-sustaining treatment, including withholding or withdrawing life-sustaining treatment and the termination of life support; and

(4) directions to provide, withhold or withdraw artificial nutrition and hydration and all other forms of health care.

Section 24–7A–2 authorizes competent adults and emancipated minors to make their own health-care decisions and to give an "advance health-care directive," which is "an individual instruction or a power of attorney for health care." Section 24–7A–1(A). An "individual instruction" is "an individual's direction concerning a health-care decision for the individual, made while the individual has capacity." Section 24–7A–1(J). An instruction must be in writing if not made by personally informing the health-care provider. *See* § 24–7A–2(A). A power of attorney for health care must be in writing and remains in effect after the person executing it becomes incapacitated. *See* § 24–7A–2(B). The agent authorized by such a power of attorney should follow the principal's instructions and, to the extent known by the agent, the principal's wishes; otherwise, the agent is to make the health-care decision "in accordance with the agent's determination of the principal's best interest," taking into account the agent's knowledge of the principal's personal values. Section 24–7A–2(E). The agent need not obtain judicial approval for the agent's health-care decision to be effective. *See* § 24–7A–2(F).

{9} In addition, a person may include in an advance health-care directive the nomination of someone to be the person's guardian. *See* § 24–7A–2(G). The guardian must then be judicially appointed for that purpose, *see* § 24–7A–1(E), in accordance with NMSA 1978, Section 45–5–312 (1997), of the Probate Code, *see* § 24–7A–6(C). The guardian is bound by the patient's individual instructions and advance health-care directive, absent court authorization to the contrary. *See* § 24–7A–6(A). Similarly, a health-care decision of an agent pursuant to a power of attorney takes precedence over that of a guardian, absent a contrary direction from the court. *See* § 24–7A–6(B). Otherwise, a guardian may make health-care decisions that are effective without judicial approval. *See* § 24–7A–6(C).

{10} The UH–CDA also provides for a surrogate, who may make health-care decisions for an incapacitated patient when either "no agent or guardian has been appointed or the agent or guardian is not reasonably available." Section 24–7A–5. A patient who is a competent adult or emancipated minor can personally inform the supervising health-care

provider of who is to serve as the surrogate. *See* § 24–7A–5(B). When no such designation has been made, the statute sets forth a priority list of who should act as surrogate. Section 24–7A–5(B) states in pertinent part:

> In the absence of a designation or if the designee is not reasonably available, any member of the following classes of the patient's family who is reasonably available, in descending order of priority, may act as surrogate:
>
> (1) the spouse, unless legally separated or unless there is a pending petition for annulment, divorce, dissolution of marriage or legal separation;
>
> (2) an individual in a long-term relationship of indefinite duration with the patient in which the individual has demonstrated an actual commitment to the patient similar to the commitment of a spouse and in which the individual and the patient consider themselves to be responsible for each other's well-being;
>
> (3) an adult child;
>
> (4) a parent;
>
> (5) an adult brother or sister; or
>
> (6) a grandparent.

"If none of [these] individuals ... is reasonably available, an adult who has exhibited special care and concern for the patient, who is familiar with the patient's personal values and who is reasonably available may act as surrogate." *See* § 24–7A–5(C).

{11} The duties of the surrogate are set forth in Section 24–7A–5(F). It states:

> A surrogate shall make a health-care decision in accordance with the patient's individual instructions, if any, and other wishes to the extent known to the surrogate. Otherwise, the surrogate shall make the decision in accordance with the surrogate's determination of the patient's best interest. In determining the patient's best interest, the surrogate shall consider the patient's personal values to the extent known to the surrogate.

A restriction on the surrogate's discretion is set forth in Section 24–7A–5(G), which provides: "A health-care decision made by a surrogate for a patient shall not be made solely on the basis of the patient's pre-exist-ing physical or medical condition or pre-existing or projected disability." A surrogate's decision does not require judicial approval to be effective. *See* § 24–7A–5(H).

{12} Decision making for unemancipated minors is covered by a separate section of the Act. *See* § 24–7A–6.1. For the purposes of this appeal, the provisions of that section need not be reviewed.

{13} The UH–CDA provides certain protections to prevent health-care decisions from being made by persons with a conflict of interest. For example, neither the agent named by a power of attorney nor a surrogate can be the "owner, operator or employee of a health-care institution at which the principal is receiving care," unless the agent or surrogate is a relative of the patient. Sections 24–7A–2(B), –5(J). Also, an insurance company cannot require a person to execute or revoke an advance health-care directive as a condition of insurance. *See* § 24–7A–2.1(A).

{14} Judicial review of health-care decisions is authorized by Section 24–7A–14. A variety of persons can petition the district court to "enjoin or direct a health-care decision or order other equitable relief." *Id.* But the district court would have occasion to take action only in limited circumstances, such as when (1) there is a question of the authority of a guardian, agent, or surrogate; (2) there is an even split among the authorized decision makers; or (3) the petitioner can persuade the court that the decision maker has not complied with statutory requirements governing agents or surrogates. *See* Uniform Act § 14 cmt., 9(I) U.L.A. at 337 (Supp. 1999).

{15} Before turning to the particular case before us, we make some general observations. First, unlike the Right to Die Act, the UH–CDA applies to all health-care decisions, broadly defined. It is not restricted to decisions regarding those who are terminally ill or in an irreversible coma. Moreover, it treats artificial nutrition and hydration just as other kinds of health care. *See* § 24–7A–1(G)(4) (including "directions to provide, withhold or withdraw artificial nutrition and

hydration" within the definition of a "health-care decision").

{16} Second, the UH–CDA focuses primarily on the procedures for decision making rather than the content of decisions. At oral argument, Professor Schwartz stated that the UH–CDA reflects a judgment that "the best way for the law to go was to decide *who* would make the decision, not what decision they ought to make." Even if the medical facts are clear, different patients can make markedly different, but still reasonable, choices, depending on their religious beliefs, their assessments of the joys of life, their tolerance for pain, their regard for others, and a multitude of other factors. Again we quote Professor Schwartz's oral remarks: "If we say it's too hard to provide standards across the board that apply in these cases, we have to figure out who is going to be in the closest position to the patient to be best able to make these decisions on behalf of the patient." To a large extent, the statute gives the patient the choice of the person who is most capable of making the decision that the patient would want made—by permitting the patient to select an agent, guardian, or surrogate. When the patient has not made a selection, however, the statute establishes a common-sense hierarchy regarding who should act as surrogate. Although the decision of the agent, guardian, or surrogate is subject to judicial review, the substantive restrictions are limited. *See, e.g.,* §§ 24–7A–5(G) (surrogate's decision should not be based solely on patient's pre-existing condition or disability); 24–7A–13(C) (statute does not authorize assisted suicide, mercy killing, or euthanasia); 24–7A–13(D) (statute does not authorize care contrary to generally accepted health-care standards). *See also* §§ 24–7A–2(E) (agent should act in accordance with patient's wishes; if wishes are unknown, decision should be in accordance with agent's determination of patient's best interest, as viewed in light of patient's personal values.); 24–7A–5(F) (similar restriction on surrogate).

{17} Third, the UH–CDA reflects concern about excessive judicial involvement. The official commentary to the Uniform Act states that "[c]ourts have no particular expertise with respect to health-care decision making." Uniform Act § 6 cmt., 9(I) U.L.A. at 330 (Supp.1999). The commentary also justifies limiting judicial involvement because "the delay attendant upon seeking court approval may undermine the effectiveness of the decision ultimately made, particularly but not only when the patient's condition is life-threatening and immediate decisions concerning treatment need to be made." *Id.*

{18} We now address P & A's standing.

### B. *Standing*

{19} New Mexico courts have been generous in granting standing. *See, e.g., New Mexico Right to Choose/NARAL v. Johnson,* 1999–NMSC–005, ¶¶ 11–14, 126 N.M. 788, 975 P.2d 841 (1998) (advocacy groups have standing to challenge abortion regulations); *John Does I through III v. Roman Catholic Church,* 1996–NMCA–094, 122 N.M. 307, 924 P.2d 273 (permitting news organizations standing to challenge protective order forbidding public release of depositions). *But cf. New Mexico Right to Choose,* 1999–NMSC–005, ¶¶ 18–21, 126 N.M. 788, 975 P.2d 841 (denying right to intervene to individuals supporting abortion regulations). In the absence of a controlling statute, "the exercise of [the Supreme] Court's discretion to confer standing should be guided by prudential considerations, particularly when litigants seek to assert claims on behalf of third parties." *New Mexico Right to Choose,* 1999–NMSC–005, ¶ 13, 126 N.M. 788, 975 P.2d 841.

{20} Prudential considerations will often support granting standing to P & A. The Protection and Advocacy for Mentally Ill Individuals Act, 42 U.S.C. §§ 10801–10851 (1994), and the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. §§ 6000–6083 (1994), provide the imprimatur for protection and advocacy systems like P & A to conduct litigation in aid of the mentally ill and developmentally disabled. *See* 42 U.S.C. § 10805(a)(1)(B), (C); 42 U.S.C. § 6042(a). Accordingly, courts have regularly granted standing to protection and advocacy systems. *See, e.g., Naughton v. Bevilacqua,* 458 F.Supp. 610, 616 (D.R.I.1978) *aff'd on other grounds,* 605 F.2d 586 (1st. Cir.

1979); *Trautz v. Weisman,* 846 F.Supp. 1160, 1163 (S.D.N.Y.1994); *Estate of Witt,* 880 S.W.2d 380 (Mo.Ct.App.1994). *But cf. Tennessee Protection & Advocacy, Inc. v. Board of Ed.,* 24 F.Supp.2d 808 (M.D.Tenn.1998) (no standing because not suing on behalf of specific individuals).

{21} In the case before us, however, we do not conduct our own analysis of prudential considerations, because standing is governed by specific statutory language. The "Judicial relief" provision of the UH–CDA is Section 24–7A–14. The first sentence of the section states:

> On petition of a patient, the patient's agent, guardian or surrogate, a health-care provider or health-care institution involved with the patient's care, [or] an individual described in Subsection B or C of Section 24–7A–5 NMSA 1978, the district court may enjoin or direct a health-care decision or order other equitable relief.

P & A belongs to none of the categories of those authorized to file a petition. Although acting, at least in its view, on behalf of Mr. Bryant, it was not his attorney. Nor is it "an individual described in Subsection B or C of Section 24–7A–5." Persons described in Subsection B include a spouse, a close relative, and

> an individual in a long-term relationship of indefinite duration with the patient in which the individual has demonstrated an actual commitment to the patient similar to the commitment of a spouse and in which the individual and the patient consider themselves to be responsible for each other's well-being.

Section 24–7A–5(B)(2). Subsection C provides that "an adult who has exhibited special care and concern for the patient, who is familiar with the patient's personal values and who is reasonably available may act as surrogate." Subsections B and C clearly describe only human beings, not artificial persons such as a corporation like P & A.

{22} Perhaps P & A would have standing under the Probate Code to question whether a guardian should be authorized to make health-care decisions for the patient. (Section 24–7A–6(C) provides that such authorization of a guardian must be in accordance with Section 45–5–312 of the Probate Code.) But we need not address that question, because the district court was not being asked to grant such authority. Either Mrs. Kirby already had that authority by virtue of the limited guardianship established in 1978 (which authority would be effective under the transitional provisions of the UH–CDA, *see* § 24–7A–16(B)), or, if she did not have the powers of a guardian, she would be the proper surrogate under Section 24–7A–5 because Mr. Bryant had no spouse, no child, and no one sharing the relationship described in Section 24–7A–5(B)(2).

{23} We acknowledge that federal law could supersede the limitations on standing in our state statute. But we are not persuaded it has done so.

{24} Under the Protection and Advocacy for Mentally Ill Individuals Act, a state protection and advocacy system, such as P & A,

(1) ha[s] the authority to—

> . . .

> (B) pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State; and

> (C) pursue administrative, legal, and other remedies on behalf of an individual who

> > (i) was a[n] individual with a mental illness; and

> > (ii) is a resident of the State,

but only with respect to matters which occur within 90 days after the date of discharge of such individual from a facility providing care or treatment.

42 U.S.C. § 10805(a)(1)(B), (C) (footnote omitted) (second alteration in original); *see Doe v. Stincer,* 175 F.3d 879 (11th Cir.1999). But that statute does not apply to Mr. Bryant. There is no contention that he had a mental illness.

{25} As for the Developmental Disabilities Assistance and Bill of Rights Act, Section 6042(a) states in pertinent part:

> In order for a State to receive an allotment under subchapter 11 of this chapter—

(1) the State must have in effect a system to protect and advocate the rights of individuals with developmental disabilities;

(2) such system must—

(A) have the authority to—

(i) pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals within the State who are or who may be eligible for treatment, services, or habilitation, or who are being considered for a change in living arrangements, with particular attention to members of ethnic and racial minority groups[.]

This language does not purport to override state-law restrictions on standing. What it says is that the federal allotment cannot be received by a state unless the protection and advocacy system has the right to pursue certain remedies. It is not our office to decide whether denial of standing to P & A in this action is inconsistent with 42 U.S.C. § 6042(a) and could be grounds for federal financial sanctions against New Mexico.

{26} Hence, we conclude that P & A lacked standing to bring this action. We can certainly understand, and appreciate, P & A's concern that health-care decisions for the developmentally disabled be made with the same respect for their lives that would be accorded other persons. Nevertheless, the scheme of the UH–CDA does not render the developmentally disabled defenseless. Not only are decisions to be made by loved ones, but other relatives, as well as medical personnel and health-care institutions, can challenge decisions that are not made with the best interests of the patient in mind, *see* § 24–7A–5(F) (absent specific instructions from the patient, surrogate must make the decision in accordance with surrogate's determination of patient's best interest), or that are "made solely on the basis of the patient's pre-existing physical or medical condition or pre-existing or projected disability," Section 24–7A–5(G). In addition, Professor Schwartz noted the possibility that P & A could report the matter to the Adult Protective Services Section if health-care decisions appear to be abusive. *See* NMSA 1978, §§ 27–7–14 to–31 (1989, as amended through 1997) (Adult Protective Services Act).

{27} Finally, we grant P & A's June 11, 1999, motion to dismiss the appeal. The motion asserted that the appeal had become moot because of an improvement in Mr. Bryant's condition. We note that a press account a few days later reported that the feeding of Mr. Bryant had resumed. On June 21, 1999, however, Mr. Bryant died.

*CONCLUSION*

{28} For the above reasons, we refused to stay the district court's order permitting termination of artificial nutrition and hydration. We wish to express our sincere appreciation to the excellent presentations of those who participated in the oral argument, with precious little time to prepare. We are particularly grateful for the assistance provided by guardian ad litem Robert Cates and amicus curiae Robert Schwartz. The appeal is dismissed.

{29} **IT IS SO ORDERED.**

ALARID and BUSTAMANTE, JJ., concur.

