# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:_____**

**Filing Date:   June 30, 2016**

**NO. S-1-SC-35478**

**KATHERINE MORRIS, M.D., AROOP MANGALIK, M.D., and AJA RIGGS,**

Plaintiffs-Petitioners,

v.

**KARI BRANDENBURG, in her official capacity as District Attorney for Bernalillo County, New Mexico, and GARY KING, in his official capacity as Attorney General of the State of New Mexico,**

Defendants-Respondents.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Nan G. Nash, District Judge**

Kennedy, Kennedy & Ives, LLC
Laura Schauer Ives
Albuquerque, NM

ACLU of New Mexico Foundation
Alexandra Freedman Smith
Albuquerque, NM

Disability Rights Legal Center
Kathryn L. Tucker
Los Angeles, CA

for Petitioners

Fuqua Law & Policy, P.C.
Scott Fuqua
Santa Fe, NM

for Respondents

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Emil J. Kiehne
Albuquerque, NM

Alliance Defending Freedom
Catherine Glenn Foster
Washington, DC

for Amici Curiae New Mexico State Senators Mark Moores, Steven P. Neville, et al.

Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, LLP
Carolyn M. "Cammie" Nichols
Albuquerque, NM

Compassion & Choices
Kevin Diaz
Portland, OR

for Amicus Curiae Compassion & Choices

Montgomery & Andrews, P.A.
Lara Katz
Santa Fe, NM

Stephen F. Gold
Philadelphia, PA

for Amici Curiae Not Dead Yet, et al.

Coberly & Martinez, LLLP
Kristina Martinez
Santa Fe, NM

for Amicus Curiae The ALS Association New Mexico Chapter

Robert Schwartz
Albuquerque, NM

for Amicus Curiae New Mexico Psychological Association

Garcia Ives Nowara LLC
Molly Schmidt Nowara
Albuquerque, NM

Covington & Burling LLP
Christina G. Kuhn
Julia F. Post
Michael S. Labson
Washington, DC

for Amici Curiae American Medical Women's Association, et al.

Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A.
Juan L. Flores
Jaime L. Dawes
Albuquerque, NM

for Amici Curiae Archbishop John Charles Wester of the Archdiocese of Santa Fe, et al.

**OPINION**

**CHÁVEZ, Justice.**

{1}     Since at least 1963 it has been a crime in New Mexico to deliberately aid another in the taking of his or her own life. *See* NMSA 1978, § 30-2-4 (1963). Yet a physician who withdraws life-sustaining treatment from a patient, at the patient's direction, and in compliance with the Uniform Health-Care Decisions Act (UHCDA), NMSA 1978, §§ 24-7A-1 to -18 (1995, as amended through 2015), is immune from criminal liability for such actions. Section 24-7A-9(A)(1). And a physician who administers pain medication to a patient in compliance with the New Mexico Pain Relief Act, NMSA 1978, §§ 24-2D-1 to -6 (1999, as amended through 2012), even if doing so hastens the patient's death, is also immune from criminal liability. *See* § 24-2D-3. The question in this case is whether a mentally competent, terminally ill patient has a constitutional right to have a willing physician, consistent with accepted medical practices, prescribe a safe medication that the patient may self-administer for the purpose of peacefully ending the patient's life. If we answer yes to the question, a willing physician may assist the patient and avoid criminal liability because Section 30-2-4 would be unconstitutional as applied to the physician. If we answer no to the question, the alternatives for the patient are to (1) endure the prolonged physical and psychological consequences of a terminal medical condition that the patient finds

intolerable; or (2) take his or her own life, possibly by violent or dangerous means.

{2} It is not easy to define who would qualify to be a terminally ill patient, or what would be the criteria for assuring a patient is competent to make an end-of-life decision, or what medical practices are acceptable to aid a patient in dying, or what constitutes a safe medication. These concerns require robust debate in the legislative and the executive branches of government. Although the State does not have a legitimate interest in preserving a painful and debilitating life that will imminently come to an end, the State does have a legitimate interest in providing positive protections to ensure that a terminally ill patient's end-of-life decision is informed, independent, and procedurally safe. More specifically, the State has legitimate interests in (1) protecting the integrity and ethics of the medical profession; (2) protecting vulnerable groups—including the poor, the elderly, and disabled persons—from the risk of subtle coercion and undue influence in end-of-life situations, including pressures associated with the substantial financial burden of end-of-life health care costs; and (3) protecting against voluntary or involuntary euthanasia because if physician aid in dying is a constitutional right, it must be made available to everyone, even when a duly appointed surrogate makes the decision, and even when the patient is unable to self-administer the life-ending medication.

2

Therefore, we decline to hold that there is an absolute and fundamental constitutional right to a physician's aid in dying and conclude that Section 30-2-4 is not unconstitutional on its face or as applied to Petitioners in this case.

**I.      BACKGROUND AND PROCEDURAL HISTORY**

{3}      Although her cancer is now in remission, Aja Riggs says that it would bring her "peace of mind" to have the option to end her suffering by choosing aid in dying if she eventually becomes terminally ill.  Ms. Riggs was diagnosed with uterine cancer in August 2011.  After a surgery several months later, doctors informed her that her cancer was more extensive than they had initially thought and was "the most aggressive kind."  At that point, she began chemotherapy.  The chemotherapy caused Ms. Riggs to feel "extreme fatigue," sometimes to the point where "it was too much effort to even talk."  She suffered serious adverse reactions to the cancer treatments, including several trips to the emergency room for an anaphylactic reaction, severe pain in her veins, and a nearly fatal infection.  Several months into chemotherapy, her doctors discovered a cancerous tumor, and Ms. Riggs immediately began additional radiation therapy.  She experienced many painful side effects from this treatment, including a burning sensation on her skin, constant nausea, and fatigue.

{4}      During these excruciating treatments, Ms. Riggs says that she "began to think

3

very seriously about what a death from cancer might be like," and she was not sure whether she wanted "to go all the way to the end of a death from cancer." She was afraid that eventually she would be "lying in bed in pain, or struggling not to be in pain, or mostly unconscious with everybody that cares about me around me and all of us just waiting for me to die." She considered the possibility of a "more peaceful death," but she still did not want to discuss it with her closest family and friends or her doctor because she "didn't want to implicate anybody else in what might be a crime." As a result, she thought that the choice to end her suffering would require her to "die alone and in isolation." By contrast, Ms. Riggs believed that a good death would involve

> having the presence of the people that I care about the most, who care about me the most; being at home, not being in the hospital; not having a lot of medical interventions that interfere with my ability to communicate or function as I would like to; to not have pain to the extent that it compromises my ability to connect with people or to be present in the moment; a sense of gentleness and peace to it.

{5} According to Petitioners in this case, under certain circumstances, physician aid in dying could afford Ms. Riggs precisely the peaceful death surrounded by family members for which she hopes, rather than the agonizing, unpleasant, and lonely death that she fears. Petitioners define aid in dying as "a recognized term of art for the medical practice of providing a mentally-competent, terminally-ill patient with a

4

prescription for medication that the patient may choose to take in order to bring about a peaceful death if the patient finds his [or her] dying process unbearable." This practice is explicitly permitted and regulated by statute in four states: Oregon, Washington, Vermont, and California. *See* Oregon Death with Dignity Act, Or. Rev. Stat. §§ 127.800 to .897 (1995, as amended through 2013); The Washington Death with Dignity Act, Wash. Rev. Code §§ 70.245.010 to .220 & 70.245.901 to .904 (2008); Vermont Patient Choice at the End of Life Act, Vt. Stat. Ann. tit. 18, §§ 5281 to 5293 (2013, as amended through 2015); California End of Life Option Act, Cal. Health & Safety Code §§ 443 to 443.22 (2016). Therefore, there is a minor but growing trend among states to recognize physician aid in dying through legislation. Further, in 2009, the Montana Supreme Court held that a terminally ill patient's choice of physician aid in dying can be a valid consent defense to a charge of homicide brought against a physician. *Baxter v. State*, 2009 MT 449, ¶ 50, 224 P.3d 1211. No appellate court has held that there is a constitutional right to physician aid in dying.

{6} Dr. Katherine Morris, a surgical oncologist at the University of New Mexico, and Dr. Aroop Mangalik, clinical director at the UNM Cancer and Research Treatment Center, want to provide the option of aid in dying for their terminally ill

patients in New Mexico. Dr. Morris previously practiced medicine in Oregon, where she provided physician aid in dying to two patients pursuant to that state's Death with Dignity Act. She testified that when these patients received a lethal prescription they "expressed a feeling of peace that they had this option, and it seemed to relieve some of their suffering that was related directly to loss of control over their own bodies." Dr. Morris detailed some of the physical ailments that these patients endured in the time immediately preceding death. One of Dr. Morris's patients had a recurring tumor on her chest wall, parts of which would continually die and "essentially [become] rotting meat;" the smell from the tumor was right under the patient's nose, which made it difficult for her to eat. Dr. Morris recalled that another patient, "a fireman, a really strong and vital guy," had skin cancer that metastasized to his spine:

> [H]e was in so much pain and we tried everything. We tried very aggressive pain management. We tried huge doses of narcotics, muscle relaxants, sedatives. We tried an implanted spinal pain pump. The best we could do for this poor man was make him unconscious. If he was awake, he was, literally, sobbing in pain.

Dr. Morris stated that terminal illness can also be psychologically challenging for patients due to a rapid loss of control over their bodily functions and a decline in their autonomy.

{7}     Dr. Morris also testified about other end-of-life options that, unlike aid in

dying, are explicitly permitted by statute in New Mexico. For example, the UHCDA permits patients to provide advance directives to withdraw or withhold life-sustaining treatment and withdraw or withhold artificial nutrition and hydration. Sections 24-7A-1(G)(3)-(4); *see* § 24-7A-2. Dr. Morris testified that sometimes doctors will remove a patient from devices that are effectively keeping that patient alive. For example, a doctor may remove a patient from a dialysis machine, which will cause the patient's kidneys to fail and the patient to die. A doctor may also remove a patient from a ventilator that assists the patient's breathing, which then causes the patient to suffocate and die. The decision to end the patient's life by withdrawing life-sustaining treatment is typically made by the patient, or through an advance directive from the patient if the patient is unconscious or incompetent, or in the absence of an advance directive, a family member or close friend must make the decision on the patient's behalf. *See* § 24-7A-2. Once the decision has been made, the medical professional then actively removes the patient from the life-sustaining device. *See* §§ 24-7A-1(A), -2.

{8}     Similarly, the Pain Relief Act protects physicians who prescribe medication for purposes of pain relief under accepted standards of practice, even in situations where the patient's death may be hastened by the treatment. *See* § 24-2D-3. Accordingly,

7

doctors may provide palliative sedation, also called "terminal sedation," a practice that can hasten the patient's death. For example, Dr. Morris stated that sometimes, when a patient is in severe pain, doctors will sedate that patient into an unconscious state, and that when people are sedated to that degree, "it suppresses their breathing and sometimes ends [a patient's] life." Similar to deciding to withdraw life-sustaining treatment, a patient, a patient through an advance directive, or a patient's family member on the patient's behalf may make the ultimate decision to submit to palliative sedation, a choice that could cause the patient to die soon thereafter.

{9} According to Petitioners, the statutory schemes that regulate aid in dying in other states, particularly Oregon, could guide the standard of care employed by physicians in New Mexico who would practice aid in dying. In support of this argument, Petitioners offered testimony from Dr. Eric Kress, who practices aid in dying in Montana, where the practice is legal but is not regulated by statute. Dr. Kress testified that he spent between thirty and forty hours studying the standard of care developed for physician aid in dying in Oregon and consulting with physicians who practiced there because those physicians have developed "a body of knowledge" and it would have been malpractice not to do so.

{10} In addition to stringent requirements regarding eligibility and informed

consent, *see* Or. Rev. Stat. §§ 127.800, 127.805, 127.820, 127.825, 127.830, the Oregon statute imposes waiting periods to allow time for a patient to change his or her mind, *see id.* §§ 127.840, 127.850. The patient must request the lethal prescription at least twice orally and once in writing. *Id.* § 127.840. The two oral requests must be at least fifteen days apart, and the patient must be given an opportunity to rescind his or her decision at the time of the second oral request. *Id.* The written request must be witnessed by two people, at least one of whom is a disinterested person, which means a person who is (a) not a relative by blood or marriage to the patient, (b) not aware that he or she is entitled to recover anything from the patient's estate, (c) not an employee of the health care facility where the patient resides, and (d) not the patient's physician. *Id.* § 127.897. The doctor can prescribe a lethal dose immediately following the three requests, subject to having met the two-day waiting period that follows the patient's written request. *Id.* § 127.850. The patient will then receive a lethal dose of barbiturates, such as Seconal or Pentobarbital, which the patient must then choose to self-administer. According to Dr. Nicholas Gideonse, a family practitioner in Oregon whose patients include those in need of aid of dying, these specific drugs are used "because of the high rate of certainty—not a hundred percent but 99.9 percent certainty—that [the] result of

9

falling asleep and never waking up will occur" within minutes. Yet Dr. Kress noted that these various safeguards can also make aid in dying unavailable for those too close to death to satisfy the statutory requirements.

{11} Although the Oregon statute explicitly exempts from criminal and civil liability any doctor who provides aid in dying "in good faith compliance with" that statute, *id.* § 127.885(1), Dr. Gideonse explained that if physicians fall short of the standard of care and provide substandard or negligent care, they can still lose their licenses to practice medicine, face suits from a patient's family, and/or face prosecution.

{12} Based on the undisputed testimony, Petitioners sought declaratory and injunctive relief to the effect that either (a) Section 30-2-4, New Mexico's criminal statute prohibiting assisted suicide, did not apply to the conduct defined by Petitioners as physician aid in dying; or (b) even if the statute did apply to physician aid in dying, such an application would be unconstitutional under various provisions of the New Mexico Constitution. The district court found that Section 30-2-4 applied to physician aid in dying, but agreed with Petitioners that any prosecution of that conduct would violate the patient's "fundamental right to choose aid in dying pursuant to the New Mexico Constitution's guarantee to protect life, liberty, and seeking and obtaining happiness, N.M. Const., art. II, § 4, and its substantive due

process protections, N.M. Const., art. II, § 18." Accordingly, the district court examined the application of Section 30-2-4 to physician aid in dying under strict scrutiny and held that the State had not proved that applying the statute in this manner furthered a compelling state interest. Because it had already invalidated Section 30-2-4's application to physician aid in dying on due process grounds, the district court did not address Petitioners' claims that applying Section 30-2-4 to that conduct would be "unconstitutionally vague or violate[] the guarantee of equal protection under the New Mexico Constitution."

{13} A divided Court of Appeals agreed with the district court that Section 30-2-4 applied to physician aid in dying. *Morris v. Brandenburg*, 2015-NMCA-100, ¶¶ 1, 54, 356 P.3d 564, *cert. granted*, 2015-NMCERT-008. A majority of the Court of Appeals determined that a patient's access to aid in dying did not implicate a fundamental liberty interest under Article II, Section 4 of the New Mexico Constitution and therefore reversed the district court's conclusion that strict scrutiny should apply. *Morris*, 2015-NMCA-100, ¶¶ 1, 29-47. Judge Timothy Garcia's majority opinion concluded that physician aid in dying might qualify as an important right subject to intermediate scrutiny, and Judge Garcia would have remanded the case to the district court with instructions to determine whether an intermediate

11

scrutiny test or a rational basis test was warranted and to apply the appropriate level of scrutiny to Petitioners' claims. *Id.* ¶¶ 49-54. Judge Miles Hanisee concurred in part, clarifying that he would hold that aid in dying is neither a fundamental nor an important right, and that there is a rational basis to justify applying Section 30-2-4 to physician aid in dying. *Morris*, 2015-NMCA-100, ¶¶ 58-70 (Hanisee, J., concurring in part). Finally, Judge Linda Vanzi filed a dissenting opinion. Based on recent trends in federal due process jurisprudence, Judge Vanzi would "hold that Article II, Section 18 affords New Mexico citizens a fundamental, or at least important, liberty right to aid in dying from a willing physician," *Morris*, 2015-NMCA-100, ¶ 104 (Vanzi, J., dissenting), and the articulated government interests, while compelling or substantial in the abstract, do not justify infringing on the right, *id.* ¶ 121 (Vanzi, J., dissenting). Thus, the divided Court of Appeals opinion did not express a majority view as to which level of scrutiny should apply. We address Petitioners' due process claims under Article II, Sections 4 and 18 of the New Mexico Constitution.

## II.    SECTION 30-2-4 PROHIBITS PHYSICIAN AID IN DYING

{14}    We must first determine whether Section 30-2-4 applies to the practice of physician aid in dying as described by Petitioners. If the statute does not apply, then it resolves the case, and we need not address Petitioners' constitutional claims. *See*

12

*Allen v. LeMaster*, 2012-NMSC-001, ¶ 28, 267 P.3d 806 ("It is an enduring principle of constitutional jurisprudence that courts will avoid deciding constitutional questions unless required to do so. We have repeatedly declined to decide constitutional questions unless necessary to the disposition of the case." (internal quotation marks and citation omitted)). "Our principal goal in interpreting statutes is to give effect to the Legislature's intent." *Griego v. Oliver*, 2014-NMSC-003, ¶ 20, 316 P.3d 865. We review issues of statutory interpretation de novo. *State ex rel. Children, Youth & Families Dep't v. Maurice H.* (*In re Grace H.*), 2014-NMSC-034, ¶ 34, 335 P.3d 746.

{15}    Section 30-2-4 prohibits "assisting suicide," which is defined as "deliberately aiding another in the taking of his own life." Unless it would lead to an unreasonable result, we regard a statute's definition of a term as the Legislature's intended meaning. *Sw. Land Inv., Inc. v. Hubbart*, 1993-NMSC-072, ¶ 6, 116 N.M. 742, 867 P.2d 412. Because Section 30-2-4 explicitly defines "assisting suicide," we must examine whether the conduct that Petitioners refer to as physician aid in dying fits the statutory definition. Petitioners define physician aid in dying as "the medical practice of providing a mentally-competent, terminally-ill patient with a prescription for medication that the patient may choose to take in order to bring about a peaceful

13

death if the patient finds his [or her] dying process unbearable." As Petitioners' own witnesses admitted during trial, and as is self-evident in the very definition of aid in dying offered by Petitioners, the practice of aid in dying involves a physician deliberately prescribing a lethal dose of barbiturates with the understanding that the patient will self-administer the entire dose to end his or her life, should the patient choose to do so. In the context of Section 30-2-4, the wrongful act is "aiding," which consists of "providing the means to commit suicide," as distinct from "actively performing the act which results in death." *State v. Sexson*, 1994-NMCA-004, ¶ 15, 117 N.M. 113, 869 P.2d 301. For aid in dying, the lethal dose prescribed by a physician is intended to provide the means for a patient to end his or her own life, which is consistent with how "aiding" has been defined under Section 30-2-4. Therefore, when providing aid in dying, a doctor prescribes a lethal dose of barbiturates *for the patient's use* as a means to end his or her own life—conduct clearly encompassed by the plain language of Section 30-2-4.

{16} Petitioners raise several arguments as to why we should go beyond the plain language of Section 30-2-4 and conclude that the Legislature did not intend that the criminal prohibition on assisting suicide should apply to physician aid in dying. First, Petitioners elicited detailed expert testimony explaining that the medical and

14

psychological professions do not consider a death from aid in dying to be a suicide[1] and that the medical profession considers the underlying cause of death brought on by aid in dying to be the terminal illness itself. According to Petitioners, Section 30-2-4 was only intended to address acts of suicide, which are distinct from aid in dying. While Petitioners' contentions regarding evolving views on suicide and its distinctions from aid in dying are compelling, our analysis is bound by the statutory language, which broadly defines suicide under Section 30-2-4 as "the taking of [one's] own life" and does not track such clinical and emotional distinctions urged by Petitioners and recognized by professionals in the fields of medicine and

[1]For example, Dr. David Pollack, a licensed psychiatrist who teaches at the Center for Ethics and Healthcare at Oregon Health and Science University, opined that a death from aid in dying is not the same as a suicide. Suicide is typically brought on by a "psychiatric condition" such as depression and is characteristically an "impulsive" and "solitary act." Accordingly, the family of a suicide victim will usually experience "surprise, . . . shock and disbelief or anger, a whole set of emotional reactions . . . reflecting a lack of connection between the person who committed suicide" and those closest to that person. By contrast, aid in dying is characterized by a "deliberative process," which "almost always involves the person discussing [aid in dying] with [his or her] family and friends." According to Dr. Pollack, patients choose aid in dying "to alleviate symptoms, to spare others from the burden of watching them dwindle away or be a shell of their former self [sic] or to feel like they are in control, have some autonomy and some control over the way that they die." As a result, family members of patients who choose aid in dying and ultimately end their lives in that manner "go through this process" with the patient, and are therefore "more prepared for the person's death and more at peace in relationship to it," as compared with the family of a suicide victim.

15

psychology. *See* § 30-2-4. Second, Petitioners put forth related arguments that the Legislature could not have considered aid in dying in 1963 when it passed Section 30-2-4 because that practice did not arise in New Mexico until later, and that applying Section 30-2-4 to aid in dying would be contrary to New Mexico's well-established public policy of favoring patient autonomy in end-of-life decision-making, as exemplified by New Mexico's 1995 adoption of the UHCDA. Indeed, New Mexico was the first state to adopt the UHCDA after the National Conference of Commissioners on Uniform State Laws approved an almost identical model act in 1993. *Prot. & Advocacy Sys., Inc. v. Presbyterian Healthcare Servs.*, 1999-NMCA-122, ¶ 6, 128 N.M. 73, 989 P.2d 890. However, the UHCDA explicitly "does not authorize mercy killing, *assisted suicide*, euthanasia or the provision, withholding or withdrawal of health care, to the extent prohibited by other statutes of this state." Section 24-7A-13(C) (emphasis added). Contrary to Petitioners' claims, the UHCDA not only distinguishes between "assisted suicide" and other end-of-life decision-making, but also assumes that the practice is "prohibited by other statutes." Importantly, the UHCDA was adopted *after* the practice of aid in dying entered the public debate, yet the Legislature persisted in refusing to authorize "assisted suicide" to the extent statutorily prohibited elsewhere, which further belies

16

Petitioner's argument that the Legislature did not intend Section 30-2-4 to apply to physician aid in dying. Third, Petitioners contend that in *Baxter*, the Montana Supreme Court relied on that state's public policy protecting patient autonomy in medical decision-making to conclude that aid in dying was not prohibited by Montana's statutory prohibition on assisted suicide, and they urge this Court to do the same. 2009 MT 449, ¶¶ 25-28. However, *Baxter* has little persuasive value in this case because the *Baxter* court merely determined that Montana's statutory consent defense, Mont. Code Ann. § 45-2-211 (1977, amended 2015), constituted a complete defense to a charge of homicide for a physician who practiced aid in dying, so long as none of the exceptions to the consent statute applied.[2] 2009 MT 449, ¶ 50. By contrast, our inquiry in this case is different: we must determine whether physician aid in dying could be prosecuted under our state's homicide statutes, a premise which the *Baxter* court apparently assumed. *See id.* ¶ 13. Thus, *Baxter* also does not persuade us to diverge from a plain language interpretation of Section 30-2-4. We

---

[2]Petitioners have not raised the issue of whether a physician who provides aid in dying could have a valid common law consent defense to homicide in New Mexico; therefore, we do not address it here. *Cf. State v. Fransua*, 1973-NMCA-071, ¶ 4, 85 N.M. 173, 510 P.2d 106 (holding that New Mexico's common law consent defense was not available for a charge of aggravated battery because our state's battery laws were intended to protect the public from violent acts and to prevent a breach of the public peace).

therefore conclude that physician aid in dying falls within the proscription of Section 30-2-4.

**III.  THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION DOES NOT PROTECT THE RIGHT ASSERTED BY PETITIONERS**

{17}  Because we have determined that Section 30-2-4 could be applied to physician aid in dying, we must now examine Petitioners' constitutional claims.  Petitioners contend that application of Section 30-2-4 to physician aid in dying violates the due process provision in Article II, Section 18 and the Inherent Rights Clause in Article II, Section 4 of the New Mexico Constitution.  We further note that Petitioners do not assert an equal protection violation before us.[3]

{18}  Our state constitution's due process guarantees are analogous to the due process guarantees provided under the United States Constitution.  Article II, Section 18 of the New Mexico Constitution provides, in relevant part, that "[n]o person shall be deprived of life, liberty or property without due process of law . . . ."  The Due Process Clause of the Fourteenth Amendment to the United States Constitution

---

[3]Petitioners raised an equal protection claim before the district court, but the district court did not address Petitioners' equal protection claim and issued its decision solely on due process grounds.  Therefore, an equal protection claim is not properly before us on appeal.

18

similarly provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . . ."

{19}     When analyzing a state constitutional provision with a federal analogue, this Court employs the interstitial approach. *State v. Gomez*, 1997-NMSC-006, ¶ 20, 122 N.M. 777, 932 P.2d 1. Under the interstitial approach, we must first examine whether an asserted right is protected under an equivalent provision of the United States Constitution. *Id.* ¶ 19. If the right is protected, then, under the New Mexico Constitution, the claim is not reached. *State v. Gomez*, 1997-NMSC-006, ¶ 19. If the right is not protected, then the Court must determine whether "flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics" require a divergence from established federal precedent in determining whether the New Mexico Constitution protects the right. *State v. Gomez*, 1997-NMSC-006, ¶ 19. Although we have the power to "provide *more* liberty than is mandated by the United States Constitution" when interpreting analogous provisions in our own constitution, *Gomez*, 1997-NMSC-006, ¶ 17, "[t]he burden is on the party seeking relief under the state constitution to provide reasons for interpreting the state provisions differently from the federal provisions when there is no established precedent." *ACLU of N.M. v. City of Albuquerque*, 2006-NMCA-078,

19

¶ 18, 139 N.M. 761, 137 P.3d 1215.

{20}     In *Washington v. Glucksberg*, 521 U.S. 702 (1997), the United States Supreme Court answered a similar question to that posed by Petitioners.  In *Glucksberg*, three patients in the terminal phases of serious and painful illnesses; four doctors who practiced in Washington, occasionally treated terminally ill patients, and expressed a willingness to assist patients to end their lives if it were legal to do so; and an advocacy group sued, seeking a declaration that the Washington statute that made it a crime to "aid[] another person to attempt suicide," Wash. Rev. Code § 9A.36.060 (1994, amended 2011), was facially unconstitutional.  521 U.S. at 707-08.  The *Glucksberg* Court held that, "either on its face or 'as applied to competent, terminally ill adults who wish to hasten their deaths by obtaining medication prescribed by their doctors,' " the Washington statute did not violate the Fourteenth Amendment. *Id.* at 735 (citation omitted).

{21}     The *Glucksberg* Court began its analysis by examining the nation's history, legal traditions, and practices. *Id.* at 710.  The Court concluded that assisted-suicide bans are deeply rooted in the nation's history and for the most part remain unchanged in the codified laws of the states. *Id.* at 715-16, 719.  The Court acknowledged that at the time it was considering the issue, states were engaged in "serious, thoughtful

20

examinations of physician-assisted suicide and other similar issues," *id.* at 719, noting that many states permitted " 'living wills,' surrogate health-care decisionmaking, and the withdrawal or refusal of life-sustaining medical treatment," *id.* at 716 (citation omitted).

{22} The *Glucksberg* Court next turned to the Due Process Clause, inventorying the fundamental rights and liberties not enumerated in the Bill of Rights that are still entitled to heightened protection against government interference:

> In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the rights to marry, *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); to have children, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); to direct the education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); to marital privacy, *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); to use contraception, *ibid.*; *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); to bodily integrity, *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and to abortion, [*Planned Parenthood of Se. Pa. v.*] *Casey*[, 505 U.S. 833 (1992)]. We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment. *Cruzan* [*ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278-79 (1990)].

*Id.* at 720.

{23} To avoid transforming liberties protected by the Due Process Clause to the

policy preferences of the Court, the *Glucksberg* Court emphasized the importance of requiring parties to give careful descriptions of the asserted fundamental liberty interests to protect the fundamental rights and liberties that objectively are deeply rooted in the nation's history, and are such that neither justice nor liberty would exist if the right were sacrificed. *Id.* at 720-21. This approach was later criticized by the Court in *Obergefell v. Hodges*, ___ U.S. ___, ___, 135 S. Ct. 2584, 2602 (2015) (stating that although the Court's analysis in *Glucksberg*, which defined the right in the "most circumscribed manner, with central reference to specific historical practices," may have been appropriate for the right in that case, it was inconsistent with the Court's approach in discussing "other fundamental rights"). Chief Justice Roberts, joined by Justices Scalia and Thomas, concluded that the *Obergefell* majority opinion jettisoned the careful substantive due process approach announced in *Glucksberg*, effectively overruling the approach. *Obergefell*, ___ U.S. at ___, 135 S. Ct. at 2620-21 (Roberts, J., dissenting).

{24}     The fact remains that the *Glucksberg* Court held that it was not unconstitutional to prohibit doctors from prescribing medication to competent, terminally ill adults who wish to hasten their deaths, 521 U.S. at 735, and this holding has never been expressly overruled. The Court reached its holding by defining the right as "a right

22

to commit suicide with another's assistance." *Id.* at 724. The Court concluded that the "almost universal tradition that has long rejected the asserted right, and continues explicitly to reject it today" would require the Court "to reverse centuries of legal doctrine and practice, and strike down the considered policy choice of almost every State," *id.* at 723, something the Court was unwilling to do.

{25}    The *Glucksberg* petitioners argued that the liberty interest they pursued was consistent with the general tradition of "self-sovereignty" which included the "basic and intimate exercises of personal autonomy," primarily citing *Cruzan* and *Casey* in support of their argument. *Glucksberg*, 521 U.S. at 724 (internal quotation marks and citation omitted). In *Cruzan*, the Court assumed that the United States Constitution granted a competent person a "constitutionally protected right to refuse lifesaving hydration and nutrition." 497 U.S. at 279. However, the right identified in *Cruzan* was based on the history of the law of battery, which is the "touching of one person by another without consent," and the related common law concept of "informed consent [being] generally required for medical treatment." *Id.* at 269, 271-78. In *Casey*, the Court reaffirmed *Roe v. Wade*, 410 U.S. 113 (1973), and held that a woman has a right to have an abortion before her fetus is viable without undue government interference. *Casey*, 505 U.S. at 846. In so holding, the *Casey* Court

23

stated, "[a]t the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." *Id.* at 851.

{26} The *Glucksberg* Court acknowledged that "many rights and liberties protected by the Due Process Clause sound in personal autonomy," but emphasized that this does not mean that every important, intimate, and personal decision is so protected. 521 U.S. at 727. The Court concluded that the right to commit suicide with another's assistance "is not a fundamental liberty interest that is protected by the Due Process Clause" because the history of the law has banned and continues to ban assisted suicides. *Id.* at 728. Although the asserted right was not a fundamental liberty interest, the Washington law prohibiting assisted suicides still had to be rationally related to a legitimate government interest. *Id.*

{27} The *Glucksberg* Court articulated several government interests. The first interest is the "unqualified interest in the preservation of human life," regardless of the person's physical or mental condition. *Id.* at 728-29 (internal quotation marks and citation omitted). The second interest is the "interest in preventing suicide, and in studying, identifying, and treating its causes," particularly since research indicated

24

that if the patient responded to treatment for depression and pain, many patients would withdraw the request for physician aid in dying. *Id.* at 730. The third interest is the "interest in protecting the integrity and ethics of the medical profession" since the American Medical Association and other medical groups at the time concluded that a physician's aid of a patient in dying was incompatible with the physician's role as a healer. *Id.* at 731. The fourth interest is the "interest in protecting vulnerable groups—including the poor, the elderly, and disabled persons—from abuse, neglect, and mistakes" since there was a "real risk of subtle coercion and undue influence in end-of-life situations" and there was a risk that some would resort to physician aid in dying "to spare their families the substantial financial burden of end-of-life health-care costs." *Id.* at 731-32. The fifth and final interest is the legitimate concern that recognizing a right to physician aid in dying will lead to "broader" interpretations allowing voluntary or involuntary euthanasia because if there is a right, it must be available to everyone, even when a duly appointed surrogate makes the decision, and even when the patient is unable to self-administer the life-ending medication. *Id.* at 732-33.

{28} The *Glucksberg* Court elected not to weigh the varying interests, concluding that each is "unquestionably important and legitimate, and Washington's ban on

25

assisted suicide is at least reasonably related to their promotion and protection." *Id.* at 735. The Court concluded that the "earnest and profound debate about the morality, legality, and practicality" of physician aid in dying should continue, *see id.*, presumably in the legislative and executive branches of government.

{29} Although the Court held that the Washington law prohibiting assisted suicide did not violate the Fourteenth Amendment "either on its face or as applied to competent, terminally ill adults who wish to hasten their deaths by obtaining medication prescribed by their doctors," *id.* at 735 (internal quotation marks and citation omitted), the Court did not "foreclose the possibility that an individual plaintiff seeking to hasten [his or] her death, or a doctor whose assistance was sought, could prevail in a more particularized challenge," *id.* at 735 n.24 (internal quotation marks and citation omitted). What would constitute a "more particularized challenge" was not made clear by the Court, other than to suggest that "such a claim would have to be quite different from the ones advanced" in that case, *id.*, leaving a degree of uncertainty as to the extent and steadfastness of its holding.

{30} Justice Stevens, whose special concurrence in *Glucksberg* provoked the majority's concession in footnote 24, offered some insight into why a particularized challenge might result in a different outcome. First, Justice Stevens noted that the

three terminally ill patient-plaintiffs in *Glucksberg* died after the district court ruled in their favor, and therefore no individual plaintiff seeking to hasten her death or any doctor threatened with prosecution for assisting in the suicide of a particular patient was before the Court. *Id.* at 739 (Stevens, J., concurring). Accordingly, Justice Stevens agreed that history and tradition did not support "an open-ended constitutional right to commit suicide" or an absolute right to physician aid in dying. *See id.* at 740, 745. However, Justice Stevens noted that *Cruzan* made clear that "some individuals who no longer have the option of deciding whether to live or to die because they are already on the threshold of death have a constitutionally protected interest that may outweigh the State's interest in preserving life at all costs." *Id.* at 745. Thus, a particularized showing might be made by a terminally ill patient who is "faced not with the choice of whether to live, only of how to die," and "who is not victimized by abuse, who is not suffering from depression, and who makes a rational and voluntary decision to seek assistance in dying" after being adequately informed about patient care alternatives. *Id.* at 746-48.

{31} We conclude that *Glucksberg* controls, and therefore that the United States Constitution does not categorically protect Petitioners' asserted right, although an opening remains for a more particularized protection. Having determined that the

27

right Petitioners assert is not protected under the United States Constitution, we now turn to Petitioners' claim that New Mexico's ban on physician aid in dying, as applied to them, violates the due process and inherent rights provisions of the New Mexico Constitution. We may diverge from the *Glucksberg* precedent if we determine that the federal analysis is flawed or that New Mexico has distinct characteristics in the relevant area or that structural differences between our government and the federal government exist. *Gomez*, 1997-NMSC-006, ¶ 19. For the reasons that follow, we choose not to deviate from either the ultimate holding in *Glucksberg* or the suggestion that a more particularized showing might prevail.

## IV. THE FEDERAL ANALYSIS SET FORTH IN *GLUCKSBERG* IS NOT FLAWED

{32} The first reason we might depart from *Glucksberg* is if we conclude that the analysis is flawed. Petitioners contend that the *Glucksberg* analysis is flawed for three reasons. They argue that (1) the *Glucksberg* approach to substantive due process has since been abandoned; (2) *Glucksberg* reviewed a facial challenge that did not have the evidence we have today that demonstrates the safety of aid in dying; and (3) *Glucksberg* is in discord with New Mexico's distinct state characteristics.

{33} Petitioners are correct that the *Obergefell* majority took the *Glucksberg* Court to task for defining the right in the most circumscribed manner, referring to historical

28

practices, because the analysis was inconsistent with how other fundamental rights had been defined by the Court. *See Obergefell*, ___ U.S. at ___, 135 S. Ct. at 2602. To exemplify its concern, the *Obergefell* majority stated:

> *Loving* did not ask about a right to interracial marriage; *Turner* [*v. Safley*, 482 U.S. 78 (1987)] did not ask about a right of inmates to marry; and *Zablocki* [*v. Redhail*, 434 U.S. 374 (1978)] did not ask about a right of fathers with unpaid child support duties to marry. Rather, each case inquired about the right to marry in its comprehensive sense, asking if there was a sufficient justification for excluding the relevant class from the right.

*Id.* (internal quotation marks omitted). Despite the Court's criticism of itself, we conclude that the *Glucksberg* approach with respect to physician aid in dying is not flawed. It is much more difficult to define the interest before us—as it was for the *Glucksberg* Court—because unlike *Loving*, *Turner*, *Zablocki*, and *Obergefell*, which had as a tradition the fundamental right to marry with all of the rights, responsibilities, and divorce procedures carefully defined, we do not have such a tradition to fall back on regarding physician aid in dying. Similarly, the *Cruzan* Court interpreted informed consent alongside the statutory prohibition of battery to encompass the right of a competent adult patient to refuse medical treatment. *See* 497 U.S. at 269, 277-79. There is a marked difference between refusing medical treatment, even if doing so will hasten death, and seeking treatment which has for its

29

exclusive purpose the taking of one's life. This was the dichotomy faced by the *Glucksberg* Court. *See* 521 U.S. at 725 ("The decision to commit suicide with the assistance of another may be just as personal and profound as the decision to refuse unwanted medical treatment, but it has never enjoyed similar legal protection.").

{34}     Although this Court might quarrel with the emphasis placed on history and tradition by the *Glucksberg* Court in defining the right, we agree with its analysis concerning legitimate government interests, particularly the following three interests. First, we agree with the "interest in protecting the integrity and ethics of the medical profession," *Glucksberg*, 521 U.S. at 731, because the New Mexico Medical Board, for several stated reasons, as of November 2014 had declined to develop any guidelines or standards for aid in dying.[4]  Second, we agree with the "interest in

---

[4]In *Glucksberg*, the American Medical Association concluded that " '[p]hysician-assisted suicide is fundamentally incompatible with the physician's role as healer.' " 521 U.S. at 731 (alteration in original) (quoting American Medical Association, Code of Ethics § 2.211 (1994)). We note that in New Mexico, as recently as November 2014, the New Mexico Medical Board refused to adopt a standard of care for aid in dying; because there was not a statute in place, some members were concerned that it would be premature to create a standard of care for aid in dying before the Board knew whether it was a legal practice. *See* New Mexico Medical Board, Regular Board Meeting, Nov. 13-14, 2014, Final Minutes at 10, available at their website, http://www.nmmb.state.nm.us. The Board minutes further note that the Board was "forced to [establish guidelines] for chronic pain, but that was because there [was] a statute in place, and so unless a law is passed requiring the Medical Board to have oversight of all compassionate end of life assistance, then . . .

30

protecting vulnerable groups—including the poor, the elderly, and disabled persons—from abuse, neglect, and mistakes" since there is a "real risk of subtle coercion and undue influence in end-of-life situations," and there is a risk that some might resort to physician aid in dying "to spare their families the substantial financial burden of end-of-life health-care costs." 521 U.S. at 731-32. Third and perhaps most important, we agree with the legitimate concern that recognizing a right to physician aid in dying will lead to voluntary or involuntary euthanasia because if it is a right, it must be made available to everyone, even when a duly appointed surrogate makes the decision, and even when the patient is unable to self-administer the life-ending medication. *Id.* at 732-33. We therefore determine that the federal analysis set forth in *Glucksberg* is not flawed. This does not end our inquiry. We next determine whether there are distinctive state characteristics contained in Article II, Section 18 of the New Mexico Constitution that justify a departure from the federal analysis.

**V.    THERE ARE NO DISTINCTIVE STATE CHARACTERISTICS WITH RESPECT TO ARTICLE II, SECTION 18 OF THE NEW MEXICO CONSTITUTION THAT JUSTIFY OUR DEPARTURE FROM *GLUCKSBERG***

---

this was bad for the practice of medicine." *Id.* We therefore appreciate that some members of the medical community understand this to be a legislative issue, and that the question of whether aid in dying is truly an accepted medical practice currently remains the subject of debate within the New Mexico medical community.

{35}     Petitioners contend that New Mexico's "long, proud, extraordinary history of respecting patient autonomy and dignity at the end of life" is a distinctive characteristic requiring additional state constitutional protections of the practice of physician aid in dying.  In support of this claim, Petitioners point to several New Mexico statutes which they contend demonstrate the New Mexico Legislature's "assiduous respect for the decision-making autonomy of dying patients."  First, Petitioners note that New Mexico was the first state to adopt the UHCDA.  Pursuant to the UHCDA, patients may provide advance directives to health care providers, including directives to withdraw or withhold life-sustaining treatment and withdraw or withhold artificial nutrition and hydration.  *See* §§ 24-7A-1(G), 24-7A-2.  Second, Petitioners observe that New Mexico was one of the first three states to recognize advance directives in any form through its 1977 Right to Die Act, NMSA 1978, §§ 24-7-1 to -11 (1977, repealed 1997), which was replaced by the UHCDA.  *See* 1997 N.M. Laws, ch. 168.  Third, Petitioners point out that the Pain Relief Act protects a patient's right to obtain pain relief, even in situations where death could result.  *See* §§ 24-2D-1 to -6.

{36}     We agree that the UHCDA, the Right to Die Act, and the Pain Relief Act support the conclusion that New Mexico has historically placed great importance on

32

patient autonomy and dignity in end-of-life decision-making. However, Section 24-7A-13(C) of the UHCDA expressly disavows *assisted suicide*, undercutting Petitioners' assertion that the interests of patient dignity and autonomy protected by the UHCDA also extend to physician aid in dying. Even practices specifically allowed under the UHCDA, such as withdrawal or withholding of life-sustaining treatment, must proceed in line with the UHCDA's safeguards, or else health care providers and individuals may be held liable. *See generally* § 24-7A-10. For example, the UHCDA provides safeguards pertaining to the appointment of an agent to carry out a patient's end-of-life directives, § 24-7A-2(A)-(E), end-of-life decisions for unemancipated minors, § 24-7A-6.1, the obligations of a health-care provider after receiving a health-care decision or directive from a patient or a patient's agent, § 24-7A-7, determinations of a patient's capacity with respect to such decisions, § 24-7A-11, and disputes relating to end-of-life decisions, § 24-7A-14. These safeguards illustrate that New Mexico also recognizes, as a companion to the core values of patient dignity and autonomy, that end-of-life decisions are inherently fraught with the potential for abuse and undue influence and that the law should provide positive protections to ensure that patients have made a decision that is both informed and independent. The UHCDA may well provide a road map for future

33

legislators in determining the safeguards that are necessary to implement a form of physician aid in dying, but the statute itself does not support the inference that there is some special characteristic of New Mexico law that makes physician aid in dying a fundamental right in this state. Far from being a distinct characteristic of New Mexico law or a departure from federal law, the UHCDA codifies the right to refuse unwanted lifesaving medical treatment that the *Cruzan* Court assumed existed under the United States Constitution. *See* 497 U.S. at 279. Similar safeguards exist under the Pain Relief Act. *See* § 24-2D-3. Neither law provides a sufficient basis to depart from the established federal analysis.

{37}     Petitioners next cite both *Protection and Advocacy System* and *State v. Roper*, 1996-NMCA-073, 122 N.M. 126, 921 P.2d 322, to support their contention that New Mexico case law uniquely "reflects distinctive commitment to medical autonomy and respect for human dignity in the provision of medical care." In *Protection and Advocacy System*, our Court of Appeals described the UHCDA as reflecting a policy that "different patients can make markedly different, but still reasonable, choices" regarding end-of-life issues "depending on their religious beliefs, their assessments of the joys of life, their tolerance for pain, their regard for others, and a multitude of other factors." 1999-NMCA-122, ¶ 16. In *Roper*, the Court of Appeals kept

34

confidential a criminal defendant's blood test results, stating that doing so "gives the patient the power to reveal the private information to the persons the patient chooses, reinforcing the [physician-patient] privilege's policy of patient autonomy and privacy." 1996-NMCA-073, ¶ 13. Petitioners also allude to other implied, rather than explicit, fundamental rights recognized by this Court, including the rights of parents in the care, custody, and control of their children, *State ex rel. Children, Youth & Families Dep't v. Pamela R.D.G.* (*In re Pamela A.G.*), 2006-NMSC-019, ¶ 11, 139 N.M. 459, 134 P.3d 746; the right to freedom of personal choice in matters of family life, *Jaramillo v. Jaramillo*, 1991-NMSC-101, ¶ 20, 113 N.M. 57, 823 P.2d 299; and the right to familial integrity, *Oldfield v. Benavidez*, 1994-NMSC-006, ¶ 14, 116 N.M. 785, 867 P.2d 1167. According to Petitioners, a competent, terminally ill patient's decision to seek physician aid in dying "is rooted in these already recognized fundamental rights."

{38} The cases cited by Petitioners do not evoke any distinctive characteristics in New Mexico law that require physician aid in dying to be treated as a fundamental right. The language that Petitioners quote from *Protection and Advocacy System* describes the policy behind the UHCDA, which, as previously discussed, explicitly does *not* authorize any form of assisted suicide. Section 24-7A-13(C). *Roper* was

35

decided based on physician-patient privilege and the policy interest in preserving the confidentiality of physician-patient interactions, not, as Petitioners suggest, any special state constitutional interest in patient autonomy and privacy. 1996-NMCA-073, ¶¶ 5-13. Finally, the portions of *Pamela A.G.*, *Jaramillo*, and *Oldfield* cited by Petitioners recognize fundamental liberty interests established by federal law and do not establish any distinct feature of New Mexico law describing an expanded right that might protect physician aid in dying. For these reasons, we conclude that there are no distinctive state characteristics with respect to the due process protections of Article II, Section 18 that warrant a departure from the federal analysis holding that physician aid in dying is not a fundamental right.

**VI. PHYSICIAN AID IN DYING IS NOT A FUNDAMENTAL OR IMPORTANT RIGHT UNDER ARTICLE II, SECTION 4 OF THE NEW MEXICO CONSTITUTION**

{39} Petitioners also argue that Article II, Section 4 of the New Mexico Constitution is an independent basis on which this Court could hold that there is a fundamental right to physician aid in dying. Article II, Section 4 provides that "[a]ll persons are born equally free, and have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty, of acquiring, possessing and protecting property, and of seeking and obtaining safety and

36

happiness." Petitioners contend that, despite being "seldom interpreted" by New Mexico courts, Article II, Section 4 protects "the right for a terminal patient to choose a peaceful, dignified death through aid in dying." Petitioners argue that several opinions of this Court have acknowledged that Article II, Section 4 provides some unique sets of rights, even if the substance of those rights has remained undefined. Petitioners also urge us to give effect to Article II, Section 4 and fulfill our duty to construe our state constitution so that "no part is rendered surplusage or superfluous." *Hannett v. Jones*, 1986-NMSC-047, ¶ 13, 104 N.M. 392, 722 P.2d 643. Finally, Petitioners cite several cases from other states that interpret inherent rights provisions similar to Article II, Section 4 to guarantee rights to liberty in the home and familial protection. *See Stemple v. Herminghouser*, 3 Greene 408, 413 (Iowa 1852) (Greene, J., dissenting); *Hoff v. Berg*, 1999 ND 115, ¶ 10, 595 N.W.2d 285, 289 (N.D. 1999).

{40}     To ascertain the meaning of Article II, Section 4, we first examine the historical "milieu" from which this provision emerged in an effort to shed light on how the framers of our state constitution may have viewed it. *See State v. Gutierrez*, 1993-NMSC-062, ¶¶ 33-35, 116 N.M. 431, 863 P.2d 1052 (reviewing the historical emergence of Article II, Section 10 of the New Mexico Constitution to determine its "scope, meaning, and effect"). The language in Article II, Section 4 most likely

37

originated from the natural rights provision in the 1776 Virginia Declaration of Rights, codified in Article I, Section 1 of the Virginia Constitution. Marshall J. Ray, *What Does the Natural Rights Clause Mean to New Mexico?*, 39 N.M. L. Rev. 375, 395 (2009). Similar guarantees of inherent or inalienable rights to life, liberty, property, and seeking or pursuing and obtaining happiness have since been incorporated into a variety of state constitutions,[5] and similar language most famously appears in the second paragraph of the Declaration of Independence. In recent years, scholars have puzzled over the intended meaning and scope of such "natural rights clauses" and divined a variety of possible influences, from Aristotle to John Locke, without coming to any definitive conclusions as to whether provisions such as Article II, Section 4 were originally intended to give rise to judicially enforceable rights, or

---

[5]For example, provisions recognizing the inherent right to seek and obtain happiness and safety appear in the constitutions of Iowa (Iowa Const. art. I, § 1); California (Cal. Const. art. I, § 1) (amended in 1972 to include a right to privacy); Colorado (Colo. Const. art. II, § 3); Idaho (Idaho Const. art. I, § 1) (recognizing the right to pursue happiness and seek safety); Massachusetts (Mass. Const. Pt. I, art. 1); Nevada (Nev. Const. art. I, § 1); New Hampshire (N.H. Const. Pt. 1, art. 2) (recognizing the right to seek and obtain happiness); New Jersey (N.J. Const. art. I, § 1); North Dakota (N.D. Const. art. I, § 1) (amended in 1984 to include right to bear arms); Ohio (Ohio Const. art. I, § 1); Vermont (Vt. Const. Ch. I, art. 1); and West Virginia (W. Va. Const. art. III, § 1). Other state constitutions similarly guarantee "the pursuit of happiness" as a natural or inherent right. *See* Joseph R. Grodin, *Rediscovering the State Constitutional Right to Happiness and Safety*, 25 Hastings Const. L.Q. 1, 3-4 (1997) (citing examples).

were simply intended to set forth the general aspirations of government. *See* Linda M. Keller, *The American Rejection of Economic Rights as Human Rights & the Declaration of Independence: Does the Pursuit of Happiness Require Basic Economic Rights?*, 19 N.Y.L. Sch. J. Hum. Rts. 557, 564-78, 598-605 (2003); Joseph R. Grodin, *Rediscovering the State Constitutional Right to Happiness and Safety*, 25 Hastings Const. L.Q. 1, 11-19 (1997).

{41}    State court jurisprudence on natural rights clauses up until the New Mexico Constitution was drafted can be conceptualized under two broad "themes." *See* Ray, *supra*, at 390-94. First, most jurisdictions undertook a balancing test to weigh the exercise of the natural right against the State's inherent power to regulate public health, morals, and welfare. *Id.* at 391 n.111 (listing cases). Second, other jurisdictions viewed natural rights provisions as codifying the common law maxim, *"Sic utere tuo ut alienum non laedas"* (use your property in such a manner as not to injure that of another), which recognizes that "the natural rights clause would invalidate legislation adversely affecting personal liberty and happiness unless the[] exercise [of personal liberty or happiness] in some way harms or presents an actual and substantial risk of harm to another person." *Id.* at 391-94. However, historical interpretations of natural rights provisions provide "no conclusive evidence" as to the

39

purpose and effect that those who drafted the New Mexico Constitution may have envisioned for Article II, Section 4. *See* Ray, *supra*, at 394.

{42}     Adding to the ambiguous history of these provisions, some of the earliest cases interpreting state constitutional natural rights clauses assumed that they protected a wide variety of individual rights against state action. For example, at least five states relied on the guarantee of their natural rights provisions that all men are born equally free to declare slavery unconstitutional. *See* Steven G. Calabresi & Sofia M. Vickery, *On Liberty and the Fourteenth Amendment: The Original Understanding of the Lockean Natural Rights Guarantees*, 93 Tex. L. Rev. 1299, 1328-46 (2015) (describing cases). Similarly, the Maine Supreme Court relied on the natural rights provision contained in the Maine Constitution to hold that Native Americans living in Maine could enter into valid contracts, *Murch v. Tomer*, 21 Me. 535, 537 (1842), and that African-Americans could be citizens of Maine, *Op. of the Supreme Judicial Court*, 44 Me. 507, 515-16 (1857), and had a right to vote, *Op. of Judge Appleton*, 44 Me. 521, 522 (1857). Further, in one of the only cases to assume an affirmative right to pursue happiness, the Indiana Supreme Court held that a state prohibition law was unconstitutional because it violated "natural rights" preserved by the Indiana Constitution, including "life, liberty, and the pursuit of happiness." *Herman v. State*,

8 Ind. 545, 556, 567 (1855). The *Herman* court conceived of these rights in the context of economic liberty, including "pursuing trade and business for the acquisition of property, and . . . pursuing our happiness in using [our liberty]," and held that Indiana's legislature could not take away an individual's right to freely select what to eat or drink. *Id.* at 557-59; *cf. Sheppard v. Dowling*, 28 So. 791, 795 -96 (Ala. 1900) (upholding as constitutional a statute regulating dispensary of liquor and stating, "[p]ursuit of happiness is one of the citizen's inalienable rights. But the lines of such pursuit are not unlimited. A man's chief joy may be in the death of his enemy, yet the law does not allow him to pursue happiness in that direction.").

{43} Modern courts have arrived at differing conclusions as to whether these provisions create judicially enforceable rights and the meaning of those rights. For example, federal courts do not recognize any independent cause of action arising from the natural rights guarantee in the Declaration of Independence, which they instead regard as "a statement of ideals, not law." *Swepi, LP v. Mora Cty., N.M.*, 81 F. Supp. 3d 1075, 1172 (D.N.M. 2015) (internal quotation marks and citation omitted); *see also Troxel v. Granville*, 530 U.S. 57, 91 (2000) (Scalia, J., dissenting) ("The Declaration of Independence, however, is not a legal prescription conferring powers upon the courts . . . ."); *Coffey v. United States*, 939 F. Supp. 185, 190-91 (E.D.N.Y.

41

1996) (concluding that the plaintiff had failed to state a legal cause of action when he claimed a violation of his right to pursue happiness because the Declaration of Independence does not create judicially enforceable rights). Although natural rights provisions in state constitutions are guarantees, unlike the rights announced by the Declaration of Independence, some state courts have followed the federal example and interpreted constitutional natural rights provisions as merely aspirational and not subject to judicial enforcement. *See, e.g.*, *Sepe v. Daneker*, 68 A.2d 101, 105 (R.I. 1949) (confirming language in the Rhode Island Constitution's due process and equal protection provision stating that "[a]ll free governments are instituted for the protection, safety and happiness of the people" was merely advisory and did not give rise to a judicially enforceable right (internal quotation marks and citation omitted)).

{44}     By contrast, some states, such as Iowa, treat their natural rights clauses as granting judicially enforceable rights. *See Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168, 176 (Iowa 2004) (stating that "the constitutional protection embodied in Iowa's Inalienable Rights Clause is not a mere glittering generality without substance or meaning," but is instead "intended to secure citizens' pre-existing common law rights (sometimes known as 'natural rights') from unwarranted government restrictions" (internal quotation marks and citation omitted)). However, those cases generally

42

acknowledge that natural rights provisions do not codify absolute or fundamental rights, but instead recognize that natural rights are still subject to reasonable regulation by the state in the exercise of its police power. *See id.*; *see also Concerned Dog Owners of Cal. v. City of Los Angeles*, 123 Cal. Rptr. 3d 774, 789 (Cal. Ct. App. 2011) (liberties enumerated in the Natural Rights Clause in the California Constitution are circumscribed by the requirements of public health and safety and are generally subject to reasonable regulation). Other modern court decisions have interpreted constitutional natural rights provisions to protect privacy and personal liberty. *See Commonwealth v. Wasson*, 842 S.W.2d 487, 494-99, 501-502 (Ky. 1992) (striking down a law prohibiting private sexual acts based on a right of privacy emanating from Kentucky's natural rights provision); *In re Quinlan*, 355 A.2d 647, 663-64 (N.J. 1976) (determining that New Jersey's natural rights provision guarantees a right of privacy); *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 4, 13 (Tenn. 2000) (determining that a fundamental right of privacy arising from Tennessee's natural rights provision, among others, required strict scrutiny review of certain abortion restrictions); *but cf. Benning v. State*, 641 A.2d 757, 761 (Vt. 1994) (rejecting existence of a broad constitutional "right to be let alone" in Vermont's natural rights provision).

{45}     Similar to the cases from Iowa and California discussed above, the earliest New Mexico cases analyzed Article II, Section 4 in the context of economic and property rights and balanced an individual's inherent rights against the state's general powers to regulate and to protect the public. In *State v. Brooken*, 1914-NMSC-075, ¶¶ 1, 12-14, 17, 19 N.M. 404, 143 P. 479, the first case to discuss Article II, Section 4, this Court upheld a law that prohibited, with limited exceptions, interfering with the freedom of unaccompanied cattle under the age of seven months. The challenger in that case claimed, in part, that enforcement of the law violated his "constitutional right of acquiring, possessing, and protecting property" by preventing him from holding calves under herd. *Brooken*, 1914-NMSC-075, ¶ 8. We clarified that, under its police power, the Legislature could "provide reasonable regulations for the use and enjoyment of property" when such regulations were necessary "for the common good and the protection of others." *Id.* ¶¶ 9, 13; *see also Otero v. Zouhar*, 1984-NMCA-054, ¶ 43, 102 N.M. 493, 697 P.2d 493 (holding, without further explanation, that "inherent and inalienable rights to acquire property" under Article II, Section 4 "are not absolute, but subject to reasonable regulation"), *aff'd in part and rev'd in part on other grounds by Otero v. Zouhar*, 1985-NMSC-021, 102 N.M. 482, 697 P.2d 482, *overruled on other grounds by Grantland v. Lea Reg'l Hosp., Inc.*, 1990-NMSC-076,

44

110 N.M. 378, 796 P.2d 599.

{46} In recent years, New Mexico courts have invoked Article II, Section 4 as a prism through which we view due process and equal protection guarantees. For example, in *California First Bank v. State*, we recognized in dicta that Article II, Section 4 should not be given the same breadth as the Due Process Clause in the United States Constitution because of the specificity of the rights in Article II, Section 4. 1990-NMSC-106, ¶ 44, 111 N.M. 64, 801 P.2d 646. In that case, we reasoned that unlike the Fourteenth Amendment, "Article II, Section 4 expressly guarantees the right 'of seeking and obtaining safety,' " and thus, in "interpreting the more expansive language of Article II, Section 4," courts should be "mindful of the more intimate relationship existing between a state government and its people, as well as the more expansive role states traditionally have played in keeping and maintaining the peace within their borders." *Cal. First Bank*, 1990-NMSC-106, ¶ 44. Yet *California First Bank* expressly did not address which specific protections are provided by Article II, Section 4, and it expressly did not elaborate on whether a violation of this provision alone could ever give rise to a cause of action. *Cal. First Bank*, 1990-NMSC-106, ¶ 45.

{47} We took our dicta from *California First Bank* one step further by incorporating

45

Article II, Section 4 as a central component of our due process analysis in *Reed v. State ex rel. Ortiz*. *See* 1997-NMSC-055, ¶¶ 101-05, 124 N.M. 129, 947 P.2d 86, *rev'd*, *New Mexico ex rel. Ortiz v. Reed*, 524 U.S. 151 (1998). Reed was a criminal justice activist and former prisoner who fled Ohio and ended up in Taos, New Mexico. *Id.* ¶¶ 3-4, 9-10, 29-30. When the Governor of Ohio sought to extradite Reed and Reed was arrested by authorities in New Mexico, he filed a petition for writ of habeas corpus to challenge the constitutionality of his arrest. *Id.* ¶ 35. We affirmed the district court's grant of habeas corpus and held that Reed was not a "fugitive from justice," and thus did not qualify for extradition under the factors set forth in *Michigan v. Doran*, 439 U.S. 282 (1978). *Reed*, 1997-NMSC-055, ¶¶ 1, 40, 44, 126. The U.S. Supreme Court later issued a short per curiam opinion reversing our ruling, disavowing this Court's reliance on Reed's claims to determine that he was not a fugitive, and ordering that Reed be extradited because this Court's inquiry "went beyond the permissible inquiry in an extradition case, and permitted the litigation of issues not open in the asylum State." *New Mexico ex rel. Ortiz*, 524 U.S. at 155. However, our discussion of Article II, Section 4 remains instructive because the United States Supreme Court opinion did not affect our interpretation of that provision.

{48} Having determined that Reed was not a fugitive, we viewed his due process rights through the lens of his right to seek and obtain safety under Article II, Section 4. *Reed*, 1997-NMSC-055, ¶¶ 101-05. We observed that Article II, Section 4 guarantees the enjoyment of life and liberty as a natural, inherent, and inalienable right, and "accords the same value to the right 'of seeking and obtaining safety and happiness.' " *Reed*, 1997-NMSC-055, ¶ 102 (quoting N.M. Const., art. II, § 4). We explained that in the extraordinary circumstances of Reed's case—namely that there was undisputed evidence that Ohio officials would deprive Reed of his liberty, and possibly even his life, without due process—"the New Mexico Constitution requires the protection of [Reed's] life and safety." *Reed*, 1997-NMSC-055, ¶ 103 (citing N.M. Const., art. II, §§ 4, 18). We acknowledged that New Mexico courts "have not fully defined the scope of [Article II, Section 4]," but reasoned that "it certainly applies to individuals like Reed who were threatened with death or great bodily harm by government officials of another state, and who had no recourse or remedy within that threatening state." *Reed*, 1997-NMSC-055, ¶ 105. We concluded that Article II, Section 4 created "a more expansive guarantee of obtaining safety" than the guarantee under the United States Constitution. *Reed*, 1997-NMSC-055, ¶ 105 (internal quotation marks omitted).

47

Reed faced the deprivation of his life without due process of law if he had remained in Ohio. The New Mexico Constitution cannot tolerate such an outcome. NM Const. art. II, §§ 4 & 18. Moreover, Reed was precluded from seeking safety in Ohio. . . . He fled to New Mexico for the express purpose of finding safety. For this reason, Reed properly comes under the protection of Article II, Section 4 of the New Mexico Constitution which guarantees the right "of seeking and obtaining safety." Reed did not flee from justice. He sought refuge from injustice.

*Reed*, 1997-NMSC-055, ¶ 124.

{49} Recently in *Griego*, we quoted Article II, Section 4 before examining equal protection under its lens. *See* 2014-NMSC-003, ¶ 1; *cf. Gulf, C. & S. F. Ry. Co. v. Ellis*, 165 U.S. 150, 160 (1897) ("[I]t is always safe to read the letter of the constitution in the spirit of the Declaration of Independence. No duty rests more imperatively upon the courts than the enforcement of those constitutional provisions intended to secure that equality of rights which is the foundation of free government."). Without question, Article II, Section 4 informed our analysis in *Griego* because marriage, which is a deeply personal human relationship, can be important to the enjoyment of life, liberty, and the pursuit of happiness, and important to the protection of property interests. *See, e.g.*, 2014-NMSC-003, ¶¶ 1, 4. However, Article II, Section 4 did not create the marital relationship at issue in *Griego*; civil marriage was a historical right created by the Legislature. *See* 2014-NMSC-003, ¶¶ 20-23. We interpreted the existing marriage laws to have as their purpose bringing

48

"stability and order to the legal relationship of committed couples by defining their rights and responsibilities as to one another, their children if they choose to raise children together, and their property." *Id.* ¶ 6. The question was whether the Legislature could constitutionally deprive committed same-gender couples from "entering into a purely secular civil marriage and securing the accompanying rights, protections, and responsibilities of New Mexico laws" granted to opposite-gender couples, *id.* ¶ 3, when the disparity in treatment of these groups was viewed in the context of Article II, Section 4, *id.* ¶ 1. However, as in *Reed*, *Griego* did not construe Article II, Section 4 as an enforceable independent source of individual rights, but rather as an overarching principle which informed the equal protection guarantee of our Constitution. *See generally* 2014-NMSC-003.

{50} We have also declined to interpret Article II, Section 4 as creating a right to full recovery in tort actions. *See, e.g.*, *Trujillo v. City of Albuquerque*, 1990-NMSC-083, ¶¶ 22-23, 110 N.M. 621, 798 P.2d 571 (stating that Article II, Section 4 does not afford more protection to victims of governmental torts than do the provisions of Article II, Section 18), *overruled by Trujillo v. City of Albuquerque*, 1998-NMSC-031, 125 N.M. 721, 965 P.2d 305; *Richardson v. Carnegie Library Restaurant, Inc.*, 1988-NMSC-084, ¶ 29, 107 N.M. 688, 763 P.2d 1133 (declining to

49

interpret Article II Section 4 "as implicitly guaranteeing a fundamental right to full recovery in tort actions"), *overruled by Trujillo*, 1998-NMSC-031.

{51}    No New Mexico case provides any meaningful support to Petitioners' claim that Article II, Section 4 establishes a fundamental right "for a terminal patient to choose a peaceful, dignified death through aid in dying." Although Article II, Section 4 should inform our understanding of New Mexico's equal protection guarantee, *see Griego*, 2014-NMSC-003, ¶ 1, and may also ultimately be a source of greater due process protections than those provided under federal law, *see Cal. First Bank*, 1990-NMSC-106, ¶ 44, the Inherent Rights Clause has never been interpreted to be the exclusive source for a fundamental or important constitutional right, and on its own has always been subject to reasonable regulation. Therefore, Petitioners have not established a fundamental or important right to aid in dying under Article II, Section 4.

**VII.    THERE IS A RATIONAL BASIS FOR THE SECTION 30-2-4 PROHIBITION OF PHYSICIAN AID IN DYING**

{52}    Although we do not recognize a fundamental or important right to physician aid in dying, Section 30-2-4 must still be rationally related to legitimate government interests to be constitutional as applied to physician aid in dying. *See Wagner v. AGW Consultants*, 2005-NMSC-016, ¶¶ 24, 25, 29, 31, 137 N.M. 734, 114 P.3d 1050.

50

We respectfully acknowledge the magnitude and importance of the very personal desire of a terminally ill patient to decide how to safely and peacefully exit a painful and debilitating life. The personal autonomy to make one's own medical decisions, even those that can hasten one's own death, are recognized in the UHCDA and the Pain Relief Act, which provide numerous safeguards to protect the integrity of those decisions. The State concedes that it does not have an interest in preserving a painful and debilitating life that will end imminently. However, the State does have a legitimate interest in providing positive protections to ensure that a terminally ill patient's end-of-life decision is informed, independent, and procedurally safe.

{53} Petitioners rely on the statutory schemes in other states to guide the discussion of who would qualify for physician aid in dying. Oregon's Death with Dignity Act, the basis for the standard of care guiding Dr. Kress's practice, sets forth detailed guidelines and procedural protections that doctors must follow to legally provide this option to their terminally ill patients. To be eligible for aid in dying, the patient must be an adult, be suffering from a terminal disease, be an in-state resident, and have "voluntarily expressed his or her wish to die." *See* Or. Rev. Stat. § 127.805(1). "Terminal disease" is defined as an incurable and irreversible disease that "will, within reasonable medical judgment, produce death within six months." *Id.* §

51

127.800(12). On behalf of Petitioners, Dr. Gideonse testified that doctors are accustomed to determining to a reasonable medical certainty whether a patient has less than six months to live because that prognosis is already required to place a patient into hospice care. In other words, a terminal diagnosis is not a feature unique to aid in dying. To be eligible, the patient must also have been judged "capable," which means that in the opinion of the patient's attending physician, a court, or the patient's psychiatrist, the patient "has the ability to make and communicate health care decisions . . . including communication through persons familiar with the patient's manner of communicating." *See id.* § 127.800(3). There is no legal requirement that doctors in Oregon provide aid in dying to a qualifying patient, and individual health care providers can explicitly prohibit the practice. *Id.* § 127.885(4)-(5).

{54} Further, under the Oregon statute, two physicians must separately determine the patient's eligibility for aid in dying. *See id.* § 127.820. Dr. Kress gave an example where he sought the opinion of five other physicians who had treated a patient—a gastroenterologist, an oncologist, a surgeon, a radiologist, and a family medicine physician—as to whether the patient was terminally ill. If any examining physician determines that the patient is suffering from impaired judgment due to

depression or a psychological disorder, that physician must refer the patient to counseling, and no physician can prescribe a lethal dose to the patient. *See id.* § 127.825. Indeed, Dr. Kress testified that under the proper standard of care, he will not prescribe a lethal dose unless the patient is "clear and assertive" in requesting aid in dying. Additionally, Dr. Gideonse testified that doctors often make judgments regarding a patient's competency to make important medical decisions, and the aid in dying situation is not significantly different. The patient must also be informed of (a) his or her medical diagnosis; (b) his or her prognosis; (c) the potential risks associated with the fatal dose of medication; (d) the probable result of taking the medication, which usually results in a loss of consciousness and death within minutes; and (e) feasible alternatives including hospice care, comfort care, and pain control. *See id.* §§ 127.800(7), 127.830. In sum, it is apparent that the right described by Petitioners and, by extension, the standard of care essential to that right, has been thoroughly defined through legislation in states such as Oregon, where physician aid in dying is legal.

{55} The *Obergefell* Court concluded that defining rights in their most comprehensive sense is the correct approach for the federal substantive due process analysis. ___ U.S. at ___, 135 S. Ct. at 2602-03. Far from defining the asserted right

in this case, i.e., the right to a physician's aid in dying, in its comprehensive sense through judicial ruling, it is clear to us that such a right cannot be defined without comprehensive legislation.

{56}     New Mexico, like the rest of the nation, has historically sought to deter suicides and to punish those who assist with suicide, with limited exceptions in the UHCDA and the Pain Relief Act. However, these exceptions occurred as a result of debates in the legislative and executive branches of government, and only because of carefully drafted definitions and safeguards, which incidentally are consistent with the safeguards urged by Petitioners. Numerous examples of such definitions and safeguards exist in the UHCDA. In addition to those previously identified in paragraph 35 of this opinion, the following reflect other safeguards relevant to our analysis. "Life-sustaining treatment" is specifically defined. Section 24-7A-1(K). An insurer is prohibited from conditioning the sale of insurance on the execution of an advance health care directive. Section 24-7A-2.1(B). A health care provider cannot condition the provision of health care to the patient on the patient signing or revoking a health care directive. Section 24-7A-7(H). A health care provider may decline to comply with a health care decision "for reasons of conscience," but must treat the patient and make reasonable efforts to transfer the patient to a provider who

54

is willing to comply with the patient's directive. Section 24-7A-7(E), (G). The patient or his or her agent, surrogate, or guardian may petition a court to enjoin or authorize a health care directive. Section 24-7A-14. These and other provisions of the UHCDA further many of the government interests recognized by the *Glucksberg* Court as unquestionably legitimate, and which made Washington's ban on physician aid in dying reasonably related to their promotion and protection. *See Glucksberg*, 521 U.S. at 728-35. Indeed, if such exceptions and carve-outs to the historical national public policy of deterring suicide properly exist, they are certainly borne of the legislature and not the judiciary.

{57} In *Trujillo*, 1998-NMSC-031, ¶¶ 27, 30, 32, we adopted a rational basis test different than the federal rational basis test. This test requires the challenger to demonstrate that the legislation is not supported by a firm legal rationale or evidence in the record. *Wagner*, 2005-NMSC-016, ¶ 24. We are persuaded that end-of-life decisions are inherently fraught with the potential for abuse and undue influence as evidenced by the protections outlined in the UHCDA and the Pain Relief Act, and therefore the government interests we have identified, similar to those in *Glucksberg*, are supported by a firm legal rationale. Applying this to Petitioners' challenge, we conclude that there is a firm legal rationale behind (1) the interest in protecting the

55

integrity and ethics of the medical profession; (2) the interest in protecting vulnerable groups—including the poor, the elderly, and disabled persons—from abuse, neglect, and mistakes due to the real risk of subtle coercion and undue influence in end-of-life situations or the desire of some to resort to physician aid in dying to spare their families the substantial financial burden of end-of-life health care costs; and (3) the legitimate concern that recognizing a right to physician aid in dying will lead to voluntary or involuntary euthanasia because if it is a right, it must be made available to everyone, even when a duly appointed surrogate makes the decision, and even when the patient is unable to self-administer the life-ending medication. *See* 521 U.S. at 731-33; Part III, ¶ 27, *supra*. Petitioners nonetheless maintain that the *Glucksberg* Court either did not have the same evidence before it that we do today, including data from several states and established practices in those states, and therefore concerns addressed in *Glucksberg* are no longer valid, or never came to fruition. However, in New Mexico these very concerns are addressed in the UHCDA, which was most recently amended in 2015, indicating not only the desirability of legislation in areas such as aid in dying, but also reflecting legitimate and ongoing legal rationales that *Glucksberg* raised nearly twenty years ago which endure today. Although it is unlawful in New Mexico to assist someone in committing suicide, the exceptions

56

contained within the UHCDA and the Pain Relief Act narrow the statute's application, provided that physicians comply with the rigorous requirements of each act. Therefore, when the relevant legislation is read as a whole, Section 30-2-4 is rationally related to the aforementioned legitimate government interests. If we were to recognize an absolute, fundamental right to physician aid in dying, constitutional questions would abound regarding legislation that defined terminal illness or provided for protective procedures to assure that a patient was making an informed and independent decision. Regulation in this area is essential, given that if a patient carries out his or her end-of-life decision it cannot be reversed, even if it turns out that the patient did not make the decision of his or her own free will.

**VIII.  CONCLUSION**

{**58**}     Pursuant to New Mexico's heightened rational basis analysis, and based on the record before us and the arguments of the parties, we conclude that although physician aid in dying falls within the proscription of Section 30-2-4, this statute is neither unconstitutional on its face nor as it is applied to Petitioners. For the foregoing reasons, we reverse the district court's contrary conclusion and remand to the district court for proceedings consistent with this opinion.

{**59**}     **IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**BARBARA J. VIGIL, Justice**

_____
**JAMES M. HUDSON, District Judge**
**Sitting by designation**

58